**Brian K. SUGGS, Plaintiff,**

v.

**PAN AMERICAN LIFE INSURANCE CO., National Insurance Services, Inc., and John Tapper, Individually and d/b/a Tapper & Associates, Defendants.**

**No. 1:89–cv–829PR.**

United States District Court, S.D. Mississippi, S.D.

March 23, 1994.

William Lyman Denton, Law Offices of William L. Denton, Patti C. Golden, Patti Golden, Attorney, Biloxi, MS, for Brian K. Suggs.

Fred Mannino, Page, Mannino & Peresich, Biloxi, MS, Daniel D. Whitaker, Carey, Aylward & O'Malley, P.A., Tampa, FL, Constance Charles Willems, McGlinchey Stafford Lang, New Orleans, LA, for Pan American Life Ins. Co., National Insurance Services, Inc. and John Tapper.

## MEMORANDUM OPINION AND ORDER

PICKERING, District Judge.

This matter is before the Court on Defendants' Motion for Summary Judgment asserting ERISA preemption of Plaintiff's claims. The Court, having reviewed the briefs of the parties, the authorities cited and being otherwise fully advised in the premises, finds as follows, to-wit;

## THE ALLEGATIONS

Plaintiff's complaint alleges breach of contract, fraud in the inducement, negligent and/or intentional misrepresentation, and claims for extracontractual and punitive damages based on the alleged blatant misconduct of the Defendants and the recision of the subject policy. Defendants filed a joint answer generally denying Plaintiff's complaint and affirmatively asserting that the insurance contract at issue is covered by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq.[1] Defendants have moved for summary judgment and request the Court to hold that all of Plaintiff's causes of action arise under state common law and are preempted by the operative provisions of ERISA. 29 U.S.C. § 1144(a). Plaintiff asserts that none of his claims are preempted by ERISA.

## FACTUAL BACKGROUND

In November, 1987, the Plaintiff was employed at Poulos Pacer Tire Co. in Biloxi, Mississippi, as a tire changer/mechanic. Through his employer, he was provided with medical insurance coverage offered by Liberty National Insurance Company, which had been secured through Defendant Tapper. At that time, Defendant Tapper approached Plaintiff's employer, David Poulos, and advised him that he could obtain medical insurance at a lower rate for Poulos' employees. However, the Plaintiff had been hospitalized in 1986 for ulcers and pancreatitis and Poulos wanted to be certain that Plaintiff would be covered before he switched policies.

Defendant Tapper first sought coverage for Poulos with Blue Cross and Blue Shield of Mississippi. By his own admission, Defendant Tapper acquired Plaintiff's prior medical records and history and forwarded it to Blue Cross. After reviewing Plaintiff's medical records, Blue Cross declined coverage.

With knowledge that Blue Cross had declined to insure Plaintiff, Defendant Tapper then sought coverage with Defendant Pan

---

1. All defendants were represented by one counsel until after the filing of the summary judgment motion. Counsel for Pan Am/NIS then withdrew from representing Defendant Tapper, who has yet to secure separate counsel before this Court.

American. Tapper filled out the application for all of Poulos' employees, including the Plaintiff, and forwarded it to Pan American who issued coverage effective December 1987. According to Poulos, Tapper assured him at that time that Plaintiff was covered, so he, Poulos, canceled the Liberty National policy. Some two months later, in February 1988, Plaintiff was hospitalized for similar stomach problems for which he had been previously hospitalized. He incurred in excess of sixteen thousand dollars in medical expenses. He then submitted a claim for the expenses to Pan American, who denied the claim. In July, 1988, Pan American rescinded the policy because of alleged misrepresentations by Plaintiff on his application.

The application contained a question about prior hospitalizations within the past twenty-four months which, for Plaintiff, was answered "No". To the contrary, Plaintiff had been hospitalized some twelve to eighteen months prior to the application date for the above noted stomach problems. Tapper has admitted that he filled out the application and answered the question "No", but alleges he did so at the direction of Plaintiff. It is Tapper's explanation that Plaintiff told him the hospitalization was more than twenty-four months prior to the application, which would have made the "No" answer correct. However, the hospital records provided to Defendant Tapper clearly reveal that the "No" answer was not correct. Additionally, plaintiff and his employer, David Poulos, dispute Tapper's version of the application incident and state that Tapper was fully aware of Plaintiff's 1986 hospitalization at the time of the application. Poulos states in his affidavit that he and employee Mona Criswell were present when Suggs told Tapper that he (Suggs) was hospitalized in 1986.

Plaintiff asserts that he was not aware that Tapper had answered this question incorrectly because he did not read the application after Tapper completed it and he was not furnished a copy of the completed application with his policy as required by Miss.Code Ann. § 83–9–11 (1972).

## STANDARD OF REVIEW

■ The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judg-ment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corporation v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A Judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. In making its determination of fact on a motion for summary judgment the court must view the evidence submitted by the parties in a light most favorable to the non-moving party. *McPherson v. Rankin,* 736 F.2d 175, 178 (5th Cir. 1984). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role. *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis,* 799 F.2d 218, 222 (5th Cir.1986). "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." *Id.* "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Phillips Oil Co. v. OKC Corp.,* 812 F.2d 265, 272 (5th Cir. 1987).

## PLAINTIFF'S THEORIES

Plaintiff advances two theories as to why his claims are not preempted by ERISA. First, he argues that the policy of insurance at issue here is not an employee benefit plan under ERISA. Secondly, he argues that his claims for fraud in the inducement and violation of related insurance statutes are not preempted because: 1) they do not relate to an employee benefit plan; and 2) they are

based upon state laws which regulate insurance and are thus saved from preemption.

### PART I. ANALYSIS REQUIRED TO DETERMINE IF INSURANCE POLICIES ARE COVERED BY ERISA.

Pursuant to 29 U.S.C. § 1002 there are two types of "employee benefit plans". They are "employee welfare benefit plans" and "employee pension benefit plans". This case involves only "employee welfare benefit plans" which ERISA defines as ". . . any plan, fund, or program . . . established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment. . . ." 29 U.S.C. § 1002(1).

This Court has attempted to carefully analyze the various steps that must be taken in order to determine whether ERISA is or is not applicable to the insurance policy which is the subject of this suit. This is a tedious and cumbersome process for a case that involves hospital expenses of only some $16,-000.[2] The Court will discuss its frustrations in more detail later, but first will carefully go through the detailed analysis that this Court understands must be made to determine whether ERISA controls.

The Fifth Circuit has devised a comprehensive three part test in determining whether a particular plan or program qualifies as an "employee welfare benefit" plan subject to ERISA preemption. Under that test, the Court must determine whether a plan: (1) exists; (2) falls within the safe-harbor provision established by the Department of Labor; and (3) satisfies the primary elements of an ERISA "employee benefit plan"—established or maintained by an employer or employee

organization intending to benefit employees or members. *Meredith v. Time Ins. Co.*, 980 F.2d 352, 355 (5th Cir.1993).

### A. FIRST TEST, DOES A PLAN EXIST?

As indicated above, the first step in an analysis of whether ERISA applies is to make a determination of whether or not the particular arrangement is a "plan." The initial inquiry as to whether the "arrangement" is in fact a "plan" is governed by a test first articulated by the Eleventh Circuit in *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir. 1982) (en banc), and accepted by this Circuit in *Memorial Hosp. System v. Northbrook Life Ins. Co.*, 904 F.2d 236 (5th Cir.1990). That test is as follows:

> In determining whether a plan, fund or program (pursuant to a writing or not) is a reality a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits.

*Donovan v. Dillingham*, 688 F.2d at 1373.

As indicated above, the plan does not have to be in writing. There need be no formal document designated as "the Plan" to establish that an ERISA plan exists. *Memorial Hosp. System v. Northbrook Life Ins. Co.*, 904 F.2d at 241. Additionally, the purchase of an insurance policy does not, in and of itself, establish the existence of an ERISA plan, ". . . but the purchase is evidence of the establishment of a plan, fund, or program; the purchase of a policy or multiple policies covering a class of employees offers substantial evidence that a plan, fund, or program has been established." *Id.* at 242, *quoting Donovan v. Dillingham*, 688 F.2d at 1373. Ultimately, the determination of whether or not the arrangement is an "employee welfare benefit plan" is generally a question of fact governed by a set of well established legal standards. *See Gahn v. Allstate Life Ins. Co.*, 926 F.2d 1449 (5th Cir.1991); and *Han-*

---

**2.** "The district courts of the United States shall have jurisdiction, without regard to the amount in controversy." 29 U.S.C. § 1132(f). This Court is not concerned with the fact of having to consider this or any other case. This Court is

concerned that mere health insurance policies are being subjected to the cumbersome procedures of ERISA as will be more fully developed in this opinion.

*sen v. Continental Ins. Co.,*[3] 940 F.2d 971 (5th Cir.1991).

■ Based on controlling case law and the evidence submitted, this Court is of the opinion that it would have been obvious to a reasonable person that the intended benefits of the policy at issue here, purchased by Plaintiff's employer, were medical coverages; that the beneficiaries were the employees of Poulos Pacer Tire Company enrolled in the program; that the source of financing was by premiums paid by the employer and/or the employees and submitted by the employer to the insurer; and that the procedure for receiving benefits was to make claim with the insurer through forms provided to the employer by the insurer and completed by the insured. Thus based on applicable law, the Court finds that the policy at issue is an "employee benefit plan".[4]

### B. SECOND TEST, DOES THE PLAN FALL WITHIN THE SAFE–HARBOR PROVISION?

■ A finding by the Court that the program at issue is an "employee benefit plan" does not automatically qualify the plan, fund or program as an ERISA plan. *See Hansen v. Continental Ins. Co., supra.* Only those employee welfare benefit plans that are established or maintained by an employer or employee organization for the purpose of providing certain benefits to its employees or members, which do not fall within the safe-harbor provision established by the Department of Labor, are covered by ERISA. *Meredith v. Time Ins. Co., supra.*

Therefore, once the Court determines that the program is an "employee benefit plan", it must then look to Department of Labor regulations to determine if the arrangement is one *excluded* from ERISA's coverage. *Id. See also Kidder v. H & B Marine, Inc.,* 932 F.2d 347 (5th Cir.1991).

The Department of Labor regulations provide that the term "employee welfare benefit plan";

shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which

(1) No contributions are made by an employer or employee organization;

(2) Participation in the program is. completely voluntary for employees or members;

(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues check-offs.

29 C.F.R. § 2510.3–1(j) (1988). *See also, Terry v. Protective Life Ins. Co.,* 717 F.Supp. 1203 (S.D.Miss.1989).

■ If any one of the four factors set out in the regulations is present, the plan is not excluded from ERISA coverage by the safe-harbor provision. The Fifth Circuit has opined that the presence of the *"and* connector indicates that the existence of any one of the four criteria listed in the regulation would prevent a group insurance plan, otherwise qualifying as an ERISA plan, from being excluded from coverage under the Act." *Memorial Hosp. System v. Northbrook Life Ins. Co.,* 904 F.2d at 241, fn. 6.[5] (Emphasis .added.)

---

3. *Hansen* involved a denial of benefits under a group accidental death and dismemberment insurance policy, not a health insurance policy.

4. This Court feels that this result is contrary to the express intent of Congress and has serious reservation as to whether a group health insurance policy by itself constitutes a "plan" under the terms of ERISA, as will be more fully devel-

oped. However, this Court is bound by *Memorial Hospital, supra,* and accordingly finds this group health insurance policy to be a plan.

5. The safe-harbor provision contains a double negative as·to factors (1) and (4). Consequently, both the safe-harbor provision itself and the decisions construing it are confusing and difficult to read and interpret. *See, Kidder v. H & B Marine,*

In reviewing the factors set forth above, the Court would note that there is a factual dispute as to who paid the premiums on this policy. Plaintiff asserts that he paid 100% of the premiums. However, the subscription agreement signed by his employer indicates that the employer would be responsible for 100% of the employee's premiums with the employee responsible for 100% of dependent coverage premiums. It also appears that the entire premium refund check was sent to the employer, as the Plaintiff has testified that he never received any part of it. Plaintiff has provided the affidavit of his employer, David Poulos, as to other issues in the case, but it does not enlighten the Court on this issue. Even though the issue of who paid the premiums may ultimately be decided against Plaintiff, for purpose of this Motion, this issue is resolved in favor of Plaintiff, the non-moving party.

■ As to factor two, the subscription agreement itself provides that participation is not voluntary. It provides that for five to eight employees, all minus one must participate in the program. The employer stated that he had five full time employees, all of whom would participate in the program.

As to factor three, Tapper has testified that the employer was responsible for keeping a supply of claim and other forms and for submitting these forms to the insurer. The employer was also responsible for maintaining records and for reporting additions, changes, terminations, and other information necessary for the administration of the policies. Plaintiff's employer agreed to pay all of the premiums for his employees and to collect the dependent coverage portion of the premiums and forward all of them to the company and to pay all invoices in accordance with the terms of the agreement. While the administrative functions of the em-

ployer were somewhat nominal, they were beyond those minimal functions set forth in factor three of the Department of Labor Regulations. They were also as involved as those set out in *Memorial Hospital, supra.* As to factor four, there is no testimony that Plaintiff's employer received any consideration or remuneration as set out in the regulation. Therefore, this factor would militate in favor of exclusion of the policy from ERISA preemption. However, as set out above, the evidence submitted regarding factors 2 and 3 indicate that this policy does not come within the safe-harbor provision. The Court is, therefore, of the opinion that under controlling judicial precedents the policy in issue is not one excluded from ERISA coverage by the Department of Labor regulations.

### C. THIRD TEST, IS THE PLAN "ESTABLISHED OR MAINTAINED" UNDER THE LANGUAGE OF ERISA?

■ Once the Court finds the existence of an ."employee benefit plan" and determines that the plan is not excluded from ERISA coverage by the Department of Labor regulations, the plan still does not automatically qualify as an ERISA plan. The Court must then proceed to determine whether the plan meets the criteria adopted in this circuit which determine what plans are covered by ERISA. *See Kidder, supra; Gahn, supra;* and *Hansen, supra.* Only those employee welfare benefit plans that are "established or maintained" by an employer for the "purpose of providing certain benefits to its employees" are covered by ERISA. *See* 29 U.S.C. § 1002(1). Thus, under this requirement, the two primary elements of an ERISA plan are: (1) it must be established or maintained by an employer, and (2) the employer must have a certain intent—a pur-

---

*Inc.,* 932 F.2d 347, 352 (5th Cir.1991), wherein the court said "On a literal reading of the court's opinion, the court appears to have construed the regulation to say that if any one of the four listed factors does not appear, then the insurance program is included within the definition of an employee welfare benefit plan.... This reading of the regulation, we admit, is not compelled by the language of the regulation itself. That is, the language, [sic] compels only the reading that the four conditions are jointly sufficient for exclu-

sion; it does not compel the reading that the conditions are also individually necessary for exclusion. On the other hand, neither is this reading of the regulation necessarily precluded by the language of the regulation either. However, ... Fifth Circuit precedent precludes any interpretation of the regulation that leads to the conclusion that the employer's contribution of premiums alone is sufficient to create a group health plan. 932 F.2d at 352. (footnote and citations omitted).

pose to provide benefits to its employees. *Hansen, supra.*

Therefore, the third determination for the court in deciding whether or not this particular plan is in fact an ERISA plan is to decide whether the plan was established or maintained by Plaintiff's employer with a purpose of providing benefits set forth in 29 U.S.C. § 1002(1) to its employees.

### 1. *"ESTABLISHED AND MAINTAINED"?*

█ Ultimately, in order for a plan to be "established and maintained" by an employer and ERISA preemption to apply, the plan, fund, or program requires some control, administration, or responsibility on the part of the employer. In making the determination as to whether Poulos Pacer Tire "established or maintained" an employee benefit plan,

> "the court should [focus] on the employer ... and [its] involvement with the administration of the plan." *Gahn,* 926 F.2d at 1452. Thus, if an employer does no more than purchase insurance for her employees, and has no further involvement with the collection of premiums, administration of the policy, or submission of claims, she has not established an ERISA plan. *Kidder,* 932 F.2d at 353; *Memorial Hospital,* 904 F.2d at 242.

*Hansen v. Continental Ins. Co.,* 940 F.2d at 978.[6]

█ Plaintiff's employer, David Poulos, was the one who sought to "establish" this plan. Poulos "maintained" it within the parameters set out above by keeping a supply of claim and other forms; by submitting those forms to the insurer; being responsible for maintaining records and for reporting additions, changes, terminations, and other information necessary to the administration of the policies; agreeing to pay all of the premiums for his employees; agreeing to collect the dependent coverage portion of the premiums and to forward them to the company; and agreeing to pay all invoices in accordance with the terms of the agreement. Thus the policy in question meets the test for

"established and maintained" under applicable law. *See, Memorial Hosp. Systems v. Northbrook Life Ins. Co., supra;* and *Hansen v. Continental Ins. Co., supra.*

### 2. *"FOR THE PURPOSE OF PROVIDING BENEFITS"?*

█ After the Court has made a determination that the employer in fact "established and maintained" an employee welfare benefit plan, the other prong of the test is to establish whether the employer had a purpose to provide health insurance, accident insurance, or other specified types of benefits to its employees. In other words, the Court must find that the employer had an "intent to provide its employees with a welfare benefit program through the purchase and maintenance of [the] group insurance policy." *Memorial Hosp. System v. Northbrook Life Ins. Co.,* 904 F.2d at 241. After considering relevant case law and reviewing the evidence submitted and summarized above, this Court is of the opinion that the policy at issue, although nothing more than a group health insurance policy constituted an employee benefit plan established and maintained by Poulos Pacer Tire Company with the intent and purpose of providing medical care benefits to its employees. Therefore, under controlling case law this insurance policy is an employee benefit plan as defined by ERISA. *See, Memorial Hosp. Systems v. Northbrook Life Ins. Co., supra;* and, *Hansen v. Continental Ins. Co., supra.*

### PART II. ERISA PREVENTION.

Once the Court determines that an employee benefit plan (group health insurance policy or otherwise) is controlled by ERISA, the Court must then determine whether state law causes of action "relate to" the plan, or policy, and are thus preempted.

The Act provides, "[T]his chapter shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan...." 29 U.S.C. § 1144(a). (Emphasis added.) The Su-

---

6. The *Hansen* Court cited with approval language from *Taggart Corp. v. Life & Health Benefits Admin., Inc.,* 617 F.2d 1208 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981), discussed later in this opinion, but reached an opposite conclusion.

preme Court has held that this language is "deliberately expansive," and is designed to make regulation of employee benefit plans an exclusively federal concern. *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987).

■ Plaintiff asserts that his claims, specifically his claim for fraud in the inducement, are not preempted by ERISA because they do not "relate to" an employee benefit plan. Case law is to the contrary. "[T]he Supreme Court has announced that the term 'relate to' in the preemption provision should be given its *broadest common sense meaning:* a 'law "relates to" an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan.' " *Hansen v. Continental Life Ins. Co.,* 940 F.2d at 979; *quoting Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 2898, 77 L.Ed.2d 490 (1983). (Emphasis added.) The cases hold the preemption provision was intended to displace all state laws that fall within its sphere, even including state laws that are consistent with ERISA's substantive requirements. *See Shaw v. Delta Air Lines, Inc., supra.*

The Fifth Circuit has recently clarified the analysis of what "relate to" means:

In *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.,* 793 F.2d 1456, 1467–68 (5th Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 (1987), we determined that the most important factor for a court to consider in deciding whether a state law affects an employee benefit plan "in too tenuous, remote, or peripheral a manner to be preempted" is whether the state law affects relations among ERISA's named entities. "[Courts] are more likely to find that a state law relates to a benefit plan if it affects relations among the principal ERISA entities—the employer, the plan, the plan fiduciaries, and the beneficiaries—than if it affects relations between one of these entities and an outside party, or between two outside parties with only

an incidental effect on the plan. n19, *Id.* at 1467.

*Memorial Hosp. System v. Northbrook Life Ins. Co.,* 904 F.2d at 249.

Plaintiff asserts that *Perkins v. Time Ins. Co.,* 898 F.2d 470 (5th Cir.1990), stands for the proposition that a state law claim for fraudulent inducement relates to a benefit plan only indirectly and thus is not preempted. While that is what the Court held in regard to the selling insurance agent, that is not what the Court held in regard to the insurance company. The Court in that case held that the state law claims against Time Insurance Company did affect relations among the principal ERISA entities, that is the beneficiary, the plan itself, and the fiduciaries, and that accordingly the state law claims of the beneficiary, under the plan (policy) against Time Insurance Company (fiduciary) were preempted. That is the same situation with which this Court is confronted. Plaintiff's claims directly affect the relations among the plan, the plan fiduciaries (Pan Am and NIS), and himself as beneficiary. Thus, Plaintiff's position on this issue is simply contrary to existing case law. *See also, Corcoran v. United Healthcare, Inc.,*[7] 965 F.2d 1321 (5th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 812, 121 L.Ed.2d 684 (1992).

■ Under prevailing law, the State law claims of breach of contract, fraud in the inducement, negligent and/or intentional misrepresentation asserted by the Plaintiff against Pan American and NIS directly affect the relations among principal ERISA entities and therefore "relate to" an employee benefit plan. On this basis, Plaintiff's state law claims are preempted as to these Defendants unless excused from preemption by the saving clause as discussed below. However, Plaintiff's reasoning is correct as to Defendant Tapper. Since his state law claims against Tapper relate to an employee benefit plan only indirectly, they are not preempted by ERISA. *See, Perkins v. Time Ins. Co., supra;* and *Memorial Hospital, supra.*

---

7. *Corcoran* was a state-law wrongful death action brought by the beneficiary of a self-funded ERISA plan against a company that provides "utilization review" services to the plan, and as such, was not the typical case of insureds suing their insurer for benefits under a purchased health insurance policy.

## PART III. CONTROLLING LAW ON THE SAVING CLAUSE.

Having determined that the policy in question is covered by ERISA and that the preemption clause applies, the Court must go further and determine if the Plaintiff's state law claims nevertheless can be maintained because they are preserved by the "saving clause." ERISA's "saving clause" provides "... *nothing* in this subchapter *shall be construed to exempt* or relieve *any person from any law* of any State *which regulates insurance....*" 29 U.S.C. § 1144(b)(2)(A). (Emphasis added.) Speaking of the Conference Committee compromise that broadened ERISA's preemption clause to its present form, the Supreme Court said, "The change gave the insurance saving clause a much more significant role, *as a provision that saved an entire body of law* from the sweeping general pre-emption clause." (Emphasis added.); and "... *the saving clause is broad on its face and specific in its reference.*" *Metropolitan Life Insurance Co. v. Massachusetts,* 471 U.S. 724, 745–746, fn. 23–24, 105 S.Ct. 2380, 2392 fn. 23–24, 85 L.Ed.2d 728 (1985). (Emphasis added.) Despite this broad language describing the "saving clause," the specific controlling decisions have been to the contrary. Very few state statutes regarding insurance have survived the broad sweep of ERISA preemption, despite the "saving clause." Even in those instances in which state statutes have survived the ERISA preemption, the state remedy has not. *See Hansen v. Continental Ins. Co., supra.*

 The saving clause was intended to preserve the right of States to regulate the "business of insurance" as provided for by the McCarran–Ferguson Act. The Courts have held that in order to determine whether a State law[8] is saved from ERISA preemption, a court should examine the meaning of the phrase "business of insurance".

Three criteria are used to decide whether a law regulates the "business of insurance": "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." *Gahn v. Allstate Life Ins. Co.,* 926 F.2d at 1453 and cases cited therein. A final factor to be considered in determining if a state law is saved from preemption is whether the state law in question conflicts with the substantive provisions of ERISA—specifically, in this case, with the civil enforcement provisions set forth in 29 U.S.C. § 1132(a). The Courts have held that even if there is no direct conflict, if a state law gives an employee a remedy greater or other than a remedy set out in ERISA that there is nevertheless an implied conflict and the state law remedy is preempted. *See Pilot Life Ins. Co. v. Dedeaux, supra,* and *Hansen, supra.*

 Plaintiff does not specify exactly which of his claims are "saved". However, the law is clear in this Circuit that ERISA preempts, and the saving clause does not save, a state law cause of action brought by an ERISA plan participant or beneficiary alleging improper processing of a claim for plan benefits. *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. at 48, 107 S.Ct. at 1553; and *Ramirez v. Inter–Continental Hotels,* 890 F.2d 760, 762 (5th Cir.1989). It is equally clear that ERISA preempts state law claims based on breach of contract, fraud, or negligent misrepresentation, if such theory would have the effect of orally modifying the express terms of an ERISA plan and increasing plan benefits for participants or beneficiaries who claim to have been misled. *See Memorial Hosp. System v. Northbrook Life Ins. Co.,* 904 F.2d at 245; *citing Lee v. E.I. Du Pont de Nemours & Co.,* 894 F.2d 755, 758 (5th Cir.1990); and *Cefalu v. B.F. Goodrich Co.,* 871 F.2d 1290, 1295 (5th Cir.1989).

### A. THE "TWISTING STATUTE" AND THE SAVING CLAUSE

 Plaintiff's primary argument that his claims are within the saving clause cen-

---

8. The term "State law" includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State. 29 U.S.C. § 1144(c)(1). *See also Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. at 48, fn. 1, 107 S.Ct. at 1553, fn. 1.

ters on the claims he asserts under Mississippi's "twisting statute", Miss.Code Ann. § 83–5–35 (1972), and related statutes regulating insurance. The "twisting statute" deems it an unfair and deceptive insurance practice to misrepresent the terms of an insurance policy "for the purpose of inducing or tending to induce [a] policyholder to lapse, forfeit, or surrender his insurance." Miss. Code Ann. § 83–5–35(a). However, to the Plaintiff's detriment, the Mississippi Supreme Court has held that the twisting statute does not create a cause of action for the damages caused by the activity it proscribes; rather, any such cause of action arises only under common law. *Protective Service Life Ins. Co. v. Carter*, 445 So.2d 215 (Miss.1983). The reasoning which supports this decision is that because the Commissioner of Insurance by statute is given regulatory powers over unfair competition in the insurance industry pursuant to § 83–5–33 and § 83–5–37 there is no private cause of action under § 83–5–35. This Court is *Erie* bound to follow that decision. Consequently, Plaintiff cannot go forward under § 83–5–35, the twisting statute.

### B. VIOLATION OF § 83–9–11 AND THE SAVING CLAUSE

Plaintiff contends that he was not furnished a copy of the application with his policy and thus was not able to ascertain that Tapper had answered the question as to his prior hospitalizations in the negative. Failure to provide Plaintiff a copy of his application with the policy is contrary to the provisions of Miss.Code Ann. § 83–9–11(1) (1972), which provides, "The insured shall not be bound by any statement made in an application for a policy unless a copy of such application is attached to or endorsed on the policy when issued as a part thereof." That section goes on to provide that "The falsity of any statement in the application for any policy covered by §§ 83–9–1—83–9–21 may not bar the right to recovery thereunder unless such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer." Miss.Code Ann. § 83–9–11(3) (1972).

As § 83–9–11 applies to the plan (policy) in this case it obviously "relates to" an employee benefit plan since it is directed at the application process for the policy (plan). It is therefore preempted unless it "regulates the business of insurance". Applying the "regulates the business of insurance" test, as set out in *Gahn, supra,* it is equally clear that this statute is specifically directed at and limited to the insurance industry; has the effect of spreading the policyholder's risk; and is an integral part of the policy relationship between the insurer and the insured. Additionally, the statute alone does not conflict with the civil enforcement provisions of ERISA. Therefore, the Court finds that § 83–9–11 is a state law which "regulates the business of insurance" and is thus saved from ERISA preemption. Since this section is saved, it will be utilized to determine if the policy in question can be canceled as contended by Defendant.

### C. OTHER STATE LAW AND THE SAVING CLAUSE

On issues confronting the Court for which ERISA does not provide guidance, "the Court may look to general principles of common law or state law that may be persuasive." *Southern Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 102 (5th Cir., 1993). *See also* 29 U.S.C. §§ 1001–1461 (1988).

> An insurance company that insures a plan remains an insurer for purposes of state laws "purporting to regulate insurance".... The insurance company is therefore not relieved from state insurance regulation. The ERISA plan is consequently bound by state insurance regulations insofar as they apply to the plan's insurer.

*FMC Corp. v. Holliday*, 498 U.S. 52, 61, 111 S.Ct. 403, 409, 112 L.Ed.2d 356, 366 (1990).

Under well settled Mississippi law, if an applicant for an insurance policy makes a material misrepresentation in his application, a right to rescind arises in the insurer. *Fidelity Mut. Life Ins. Co. v. Miazza*, 93 Miss. 18, 46 So. 817 (1908). Of course, the misrepresentations must affect either the acceptance of the risk or the hazard assumed by the company. Miss.Code Ann. § 83–9–11(3)

(1972). The Defendants, of course, argue that the negative answer by the Plaintiff to the question on prior hospitalizations materially affected the acceptance of the risk by the company. In other words, if the Plaintiff had answered the question in the affirmative, they would never have insured him. This Court accepts the proposition that information on prior hospitalizations is material to the acceptance of the risk.

■ Plaintiff argues, however, that there was no misrepresentation, material or otherwise, because Tapper was advised of the previous hospitalizations and even given copies of the hospital records. Defendants argue "it is irrelevant whether or not Mr. Suggs relayed this information to Mr. Tapper at the time of his enrollment" since they contend that they are not bound by information relayed to Defendant Tapper. However, under Mississippi law, if the applicant divulges the information, but the agent who fills out the form does not record the information accurately, there has been no misrepresentation. *Mattox v. Western Fidelity Ins. Co.,* 694 F.Supp. 210, 215 (N.D.Miss.1988), *citing, World Insurance Co. v. Bethea,* 230 Miss. 765, 93 So.2d 624 (1957). An insurance company "cannot avoid the policy because the application for insurance does not fully disclose information given to its agents." *National Life and Acc. Ins. Co. v. Miller,* 484 So.2d 329, 334 (Miss.1985).

■ Defendants strongly contend that Tapper was not their agent and point to language in the subscription agreement which states that Tapper was not an agent of NIS or Pan American but was in fact the agent for Poulos. Defendants ignore Miss. Code Ann. § 83–17–1 (1972) which, in pertinent part, states;

> Every person who solicits insurance on behalf of any insurance company, or who takes or transmits, other than for himself, an application for insurance or a policy of insurance, or who advertises or otherwise gives notice that he will receive or transmit the same, or who shall receive or deliver a policy of insurance of any such company, or who shall examine or inspect any risk, or receive, collect, or transmit any premium of insurance, or ... do or perform any other act or thing in the making or consummation of any contract of insurance for or with any such insurance company ... shall be held to be the agent of the company for which the act is done or the risk is taken as to all the duties and liabilities imposed by law, whatever conditions or stipulations may be contained in the policy or contract.

It is clear that this statute is specifically directed at and limited to the insurance industry; has the effect of spreading the policyholder's risk; and is an integral part of the policy relationship between the insurer and the insured. Additionally, the statute alone does not conflict with the civil enforcement provisions of ERISA. It is thus saved from ERISA preemption.

■ Since it is undisputed that Tapper took the application for the policy of insurance in question and based on § 83–17–1, John Tapper was the agent of Pan American and NIS, the policy terms not withstanding. *See also, Andrew Jackson Life Ins. Co. v. Williams,* 566 So.2d 1172 (Miss.1990); and *McCann v. Gulf Nat. Life Ins. Co., Inc.,* 574 So.2d 654 (Miss.1990).

■ Defendants make much of the fact that Suggs signed the application and admitted that he was given a chance to review the application even though he didn't take advantage of the opportunity. However, the signing of a completed application does not alter the fact that the insured has communicated the information to the agent. *Home Ins. Co. of New York v. Thornhill,* 165 Miss. 787, 144 So. 861 (1932). "Absent some proof of collusion between the applicant and the agent, which is not even alleged in this case, the information relayed to the agent is imputed to the company and the company cannot then rescind the policy because it was not told what its agent was told." *Mattox v. Western Fidelity Ins. Co.,* 694 F.Supp. at 215. *See also, Southern United Life Ins. Co. v. Caves,* 481 So.2d 764, 767 (Miss.1985).

Although this court has held that there is no duty on the insurer to investigate an applicant upon receipt of the application, *Ross v. Western Fidelity Insurance Co.,* No. EC87–54–S–O (N.D.Miss. June 29,

1988) (unpublished opinion), that does not mean that the company may, in good faith, wait until a claim is filed and then determine that the claimant was not an insurable risk and avoid the policy. Uninsurability alone is not grounds for rescission of the policy. The company that refuses to investigate until after a claim is filed runs the risk that it has insured someone whom it otherwise would not have. It is indeed true that the company has the right to rely on the information supplied in the application in determining whether or not to accept the risk, *Apperson v. U.S. Fidelity & Guaranty Co.*, 318 F.2d 438, 441 (5th Cir. 1963). However, ... [a]n applicant has neither concealed nor misrepresented information when he has answered fully and truthfully all the questions asked of him. *Liverpool & London & Globe Ins. Co. v. Delaney*, 190 Miss. 404, 200 So. 440 (1941). *Mattox v. Western Fidelity Ins. Co.*, 694 F.Supp. at 216–17. Tapper testified that everytime he saw Suggs, he (Suggs) was too greasy to fill out the forms. At this stage Suggs is entitled to have the evidence viewed in the light most favorable to him. Since Suggs was always too greasy to fill out the forms, this could support a reasonable inference to confirm Suggs' testimony that he did not read the application and did not know that it was filled out incorrectly by Tapper.

There is no question that the Plaintiff's coverage was rescinded on July 25, 1988, for what the Defendants term "his material omission on his enrollment card." It is equally clear that § 83–9–11 forbids the Plaintiff being bound by any statement made in the application if he was not furnished a copy of the application with his copy of the policy. Defendants do not contest Plaintiff's contention that he was not provided a copy of the application when the policy was delivered to Plaintiff. It is therefore clear that the Defendants were not entitled to deny coverage based on any allegedly false statement made by the Plaintiff in the application. As the record now stands, had Plaintiff moved for summary judgment on this issue, it would have been granted. Since Miss.Code Ann. § 83–17–1 (1972) is likewise saved, Defendant Pan American and NIS will be bound by what the evidence establishes was told to

Tapper about Plaintiff's previous hospitalizations.

In *Gahn*, the Fifth Circuit considered the question of whether ERISA preempted a Louisiana statute prohibiting an insurance company from terminating an insurance policy after an insured was diagnosed with liver cancer. The situation before this Court and the two statutes discussed above are analogous to the situation presented in *Gahn* and the Louisiana statute involved in that case. Holding that ERISA did not preempt such a statute the Court in that case cited a Louisiana case, *Cataldie v. Louisiana Health Service & Indem. Co.*, 456 So.2d 1373 (La.1984), and said, "The court also stated that it would be unconscionable to allow an insurance company to wait until a risk had been realized before canceling a policy, making it impossible for the insured to obtain insurance from any other carrier." *Gahn v. Allstate Life Ins. Co.*, 926 F.2d at 1455. Likewise it would be unconscionable for an insurance agent to make representations to an insured that would cause him to lapse a policy that provided him coverage for his existing or preexisting conditions and to purchase a policy that provided absolutely no coverage.

Although §§ 83–9–11 and 83–17–1 are saved for the purpose of determining if the policy in question is subject to cancellation for the reasons stated, the remedies available under state law are not saved against Defendants NIS and Pan American as will be discussed in the next paragraphs.

### PART IV. WHAT REMEDIES ARE NOT AVAILABLE UNDER ERISA?

▇ Plaintiff asserts that if § 83–9–11 and § 83–17–1 are saved from ERISA preemption, then he is entitled to pursue his full range of remedies under state common law. His reasoning is that once a law is saved from preemption, he is entitled to pursue any remedy available thereunder. This argument is contrary to case law. "In short, when beneficiaries seek to recover benefits from a plan covered by ERISA, their *exclusive remedy is provided by ERISA*, in 29 U.S.C. § 1132(a)(1)(B)." *Hansen v. Conti-*

*nental Ins. Co.,* 940 F.2d at 979; *quoting, Degan v. Ford Motor Co.,* 869 F.2d 889, 893 (5th Cir.1989). (Emphasis added.) Thus, although these state laws are saved insofar as they will help the Court determine whether the policy in question can be canceled, the only remedies available to Plaintiff are those found in ERISA.

Any argument that one is entitled to seek any relief regarding an ERISA plan other than that set forth in the civil enforcement provisions will face the Supreme Court's edict that "[t]he six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted [29 U.S.C. § 1132(a) ], . . ., provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 146, 105 S.Ct. 3085, 3092, 87 L.Ed.2d 96 (1985). (Emphasis in original). However, only two of these remedies are available to an individual plan participant or insured.

If Plaintiff's remedies are limited to ERISA, he argues that federal courts are under a mandate from Congress and the Supreme Court to "... develop a federal common law of rights and obligations under ERISA-regulated plans." *Pilot Life Ins. Co. v. Dedeaux, supra,* 481 U.S. at 56, 107 S.Ct. at 1557. *See also* 129 Cong.Rec. 29942 (1974) (remarks of Sen. Javits). "However, this power extends only to areas which federal law preempts but does not address." *Degan v. Ford Motor Co.,* 869 F.2d at 895. He contends that this body of "federal common law" is to be developed from the common law of the states. Under the Plaintiff's concept of the federal common law to be developed, he would be entitled to extracontractual and punitive damages for the wrongful denial of his claim by the defendants.

■ A widely cited Eleventh Circuit case discussed the development of federal common law in ERISA cases:

> The claim that Congress intended for the federal courts to create a body of federal common law to govern ERISA cases does not, as appellant suggests, give a federal court *carte blanche* authority to apply any prevailing state common law doctrine it

chooses to ERISA cases. A federal court may create federal common law based on a federal statute's preemption of an area only where the federal statute does not expressly address the issue before the court. *See* C. Wright, *Law of Federal Courts* § 60, at 283–84 (3d Ed.1976); *see also Textile Workers Union of America v. Lincoln Mills of Alabama,* 353 U.S. 448, 456–57, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957). Furthermore, even when it is appropriate for a federal court to create federal common law, it may use state common law as the basis of the federal common law only if the state law is consistent with the policies underlying the federal statute in question; *see Lincoln Mills,* 353 U.S. at 457, 77 S.Ct. at 918; *Scott [v. Gulf Oil Corp.],* 754 F.2d [1499] at 1502 [ (9th Cir. 1985) ]; federal courts may not use state common law to re-write a federal statute.

*Nachwalter v. Christie,* 805 F.2d 956, 959–60 (11th Cir.1986).

The Fifth Circuit has recently spoken on the development of federal common law and the availability of the type damages Plaintiff seeks to pursue under ERISA:

> The plain language of this statute does not mention recovery of extracontractual or punitive damages. Nothing in the statute instructs us to fashion a federal common law remedy to grant plaintiffs the right to recover punitive or extracontractual damages. . . .
>
> We join the other circuits that have held that Section 502(a)(1)(B) does not allow the recovery of extracontractual or punitive damages.

*Medina v. Anthem Life Ins. Co.,* 983 F.2d 29, 31–32 (5th Cir.1993). It is thus clear, under prevailing federal law, that neither extracontractual nor punitive damages are available to Plaintiff as a "federal common law" remedy for any claim he may assert under 29 U.S.C. § 1132(a)(1)(B).

■ Plaintiff also argues that he can pursue extracontractual and punitive damages under the "other appropriate equitable relief" language of § 1132(a)(3). Whether such damages are available under that section had been a question since *Massachusetts Mut.*

*Life Ins. Co. v. Russell, supra.* However, the Fifth Circuit in *Corcoran v. United Healthcare, Inc.,* 965 F.2d 1321, 1335 (5th Cir.1992), has now spoken to that issue:

> Section 502(a)(3) provides relief apart from an award of benefits due under the terms of a plan. When a beneficiary simply wants what was supposed to have been distributed under the plan, the appropriate remedy is § 502(a)(1)(B).
>
> ... Damages that would give a beneficiary more than he or she is entitled to receive under the strict terms of the plan are typically termed "extracontractual." Section 502(a)(3) by its terms permits beneficiaries to obtain "other appropriate equitable relief" to redress (1) a violation of the substantive provisions of ERISA or (2) a violation of the terms of the plan.

The Fifth Circuit went on to recognize that the courts are to be guided by general principles of trust law, and to some extent by contract law, in deciding what is meant by "other appropriate equitable relief." However, it found that the emotional distress and mental anguish damages sought by the Corcorans were not recoverable under § 502(a)(3) (29 U.S.C. § 1132(a)(3)). *Id.* at 1338. *See also Medina, supra,* addressing 29 U.S.C. 1132(a)(1)(B).

In a decision handed down June 1, 1993, the U.S. Supreme Court strongly indicated [9] that "other appropriate equitable relief" includes neither compensatory nor punitive damages:

> Although they often dance around the word, what petitioners in fact seek is nothing other than compensatory *damages*—monetary relief for all losses their plan sustained as a result of the alleged breach of fiduciary duties. Money damages are, of course, the classic form of *legal* relief.... And though we have never interpreted the precise phrase "other appropriate equitable relief", we have construed similar language of Title VII of the Civil Rights Act of 1964 ...—"any other equita-

ble relief as the court deems as appropriate," ...—to preclude "awards for compensatory or punitive damages"....

*Mertens v. Hewitt Associates,* 508 U.S. ——, ——, 113 S.Ct. 2063, 2066, 124 L.Ed.2d 161, 169 (1993). (Emphasis in original). The Court went on to note that, "[t]he authority of courts to develop a 'federal common law' under ERISA, see *Firestone [Tire and Rubber Co. v. Bruch ], supra,* [489 U.S. 101,] at 110, 103 L.Ed.2d 80, 109 S.Ct. [948, at] 988, is not the authority to revise the text of the statute." *Id.,* 508 U.S. at ——, 113 S.Ct. at 2070, 124 L.Ed.2d at 172.

It is thus clear, under prevailing federal law in this Circuit that neither extracontractual nor punitive damages are available to Plaintiff as a "federal common law" remedy for any claim he may assert under 29 U.S.C. § 1132(a)(1)(B). And according to *Mertens, supra,* the same is likely true as to 29 U.S.C. § 1132(a)(3).

### *PART V. THE DEEMER CLAUSE.*

 The Plaintiff finally argues the application of the "deemer clause" to the case at bar. The "deemer clause" provides; "Neither an employee benefit plan ... nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer ... or to be engaged in the business of insurance ... for purposes of any law of any State purporting to regulate insurance companies [or] insurance contracts...." 29 U.S.C. § 1144(b)(2)(B). The "deemer clause", which modifies the saving clause, strictly involves situations where there has been no purchase of an insurance policy to fund the "plan". Plans may self-insure or they may purchase insurance for their participants. Plans that purchase insurance—so-called "insured plans"—are directly affected by state laws that regulate the insurance industry. Plans that are uninsured (self-funded) are not subject to state regulation. *Metropolitan Life Insurance Co. v. Massachusetts,* 471 U.S. at 732, 105 S.Ct. at 2385. The Supreme Court has made a distinction

---

9. Petitioners sought certiorari only on the question of whether ERISA authorizes suits for money damages against nonfiduciaries who knowingly participate in a fiduciary's breach of fiduciary duty. *Mertens v. Hewitt Associates,* 508 U.S. ——, ——, 113 S.Ct. 2063, 2065, 124 L.Ed.2d 161, 166, (1993). Thus *Mertens* did not address the question of what remedies are available to an insured under § 502(a)(3) (29 U.S.C. § 1132(a)(3)).

between insured and uninsured plans by finding that the latter are exempt from the application of the saving clause and are therefore not subject to state regulation. As the Court stated;

> State laws that directly regulate insurance are "saved" but do not reach self-funded employee benefit plans because the plans may not be deemed to be insurance companies, other insurers, or engaged in the business of insurance for purposes of such state laws. On the other hand, employee benefit plans that are insured are subject to indirect state insurance regulation.

*FMC Corp. v. Holliday*, 498 U.S. at 61, 111 S.Ct. at 409.

There are no allegations by the Plaintiff that the employee benefit plan at issue here is self-funded or uninsured. It is in fact a policy of insurance issued by an insurance company. The Court cannot accept the Plaintiff's argument that the deemer clause has any application to this action.

### PART VI. INTENT OF CONGRESS THWARTED BY JUDICIAL INTERPRETATIONS.

Congress clearly set forth its intent in adopting ERISA.[10] That express intent is accepted by the courts without dispute. In one of the earliest cases interpreting ERISA the Supreme Court stated:

> ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans.

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. at 90, 103 S.Ct. at 2896, 77 L.Ed.2d at 497.

In *Hansen*, the Fifth Circuit stated:

> Congress enacted ERISA ... to protect working men and women from abuses in the administration and investment of private retirement plans and employee welfare plans.

*Hansen v. Continental Ins. Co.*, 940 F.2d at 976; *quoting, Donovan v. Dillingham*, 688 F.2d 1367, 1370 (11th Cir.1982) (en banc).

In *Pilot Life, supra*, and in *Metropolitan Life Ins. Co., supra*, the Supreme Court in interpreting ERISA said " ' "[t]he purpose of Congress is the *ultimate touchstone*." ' " (Emphasis added.) (citations omitted) 481 U.S. at 45, 107 S.Ct. at 1552 and 471 U.S. at 747, 105 S.Ct. at 2393. In *Russell*, the Supreme Court again addressed Congressional intent and stated:

> The floor debate also reveals that *the crucible of congressional concern* was misuse and mismanagement of plan assets by plan administrators and that ERISA was designed to prevent these abuses in the future. *See* Cong.Rec. 29932 (1974).

*Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. at 140–141, fn. 8, 105 S.Ct. at 3089–90, fn. 8. (Emphasis added.) The Court went on to quote various statements from members of Congress affirming Congressional intent to protect employees from abuse and fraud.

The unanimity with which Congressional intent is accepted and understood is illustrated by two quotes from Defendant's Brief. "ERISA was enacted by Congress to protect employee benefits from a multitude of abuses that workers are encountering." Defendant went on further to say "Finally, being remedial legislation ERISA should be liberally construed in favor of coverage so that the *purpose of the Act, to protect plan participants and beneficiaries, would be fulfilled*." (Emphasis added.) Despite this recognition, that is not what Defendants are attempting to do in this case. What Defendants are attempting to do is to have "preemption" liberally construed and interpreted so that the "coverage" of the policy can be defeated.

Despite this clearly stated objective of ERISA, with so many state laws and/or remedies having been preempted, employees obviously have less protection in the field of

---

10. 29 U.S.C. § 1001 sets forth the Congressional intent in adopting ERISA: "The Congress finds ... that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; ... It is therefore desirable in the interest of employees and their beneficiaries ... that minimum standards be provided assuring the equitable character of such plans and their financial soundness ... It is hereby further declared to be the policy of this chapter to protect ... the interests of participants in private pension plans and their beneficiaries...."

health insurance today than they had before ERISA was passed in 1974. To the point that the Court in *Corcoran,* said, "the result ERISA compels us to reach means that the Corcorans have *no remedy, state or federal,* for what may have been a serious mistake. This is troubling ..." *Corcoran v. United Healthcare, Inc.,* 965 F.2d at 1338. (Emphasis added.) Even more to the point in *Hansen, supra,* the Court stated:

> ... ERISA's preemption provision bars state law causes of action even though such preemption *may leave a victim of fraud or misrepresentation without a remedy.*

*Hansen v. Continental Ins. Co.,* 940 F.2d at 979. (citation omitted) (Emphasis added.) It cannot be said that Congressional intent has been followed when the results are so clearly to the contrary.

These results remind one of the words of Welsh poet Dylan Thomas when he was describing the awesome problems created by the signature and decree of a certain monarch who had imposed great hardship upon many people. He concluded "great is the hand that holds dominion over man by a scribbled name." In many respects the judicial interpretation of ERISA has accomplished the same thing. It has preempted from application to most group health insurance policies a volume of state laws and remedies developed over many years of experience that protected insureds (employees or beneficiaries under ERISA). ERISA has not been interpreted to provide federal remedies to replace preempted state remedies.

### PART VII. HOW DID WE GET WHERE WE ARE IN THE AREA OF INSURANCE POLICIES HELD TO BE COVERED BY ERISA?

If it was Congress' primary intent to protect "employees and their beneficiaries," how is it that courts repeatedly are reaching conclusions to the contrary and providing workers less, not more protection? In the opinion of this Court that result has been brought about primarily because of the following:

(1) There has not been a consistent recognition that some provisions of ERISA that apply to private *pension* plans and self-funded welfare benefits plans might not apply to private *welfare* benefit plan funded through the purchase of insurance. Provisions that are perfectly clear and make perfectly good sense in regard to privately funded pension funds or self-funded benefit plans might not be so clear or make such perfectly good sense when applied to an insurance policy purchased by a plan.

(2) There has not been a clear distinction between "welfare benefit plans" and the "assets" of such plans, particularly in the area of health insurance policies. This is true in spite of the fact that ERISA plainly makes that distinction in providing that insurance policies, although to be considered as assets of plans, are not to be held in trust, and thus not subject to trust provisions. 29 U.S.C. § 1103(a) and (b).

(3) Principles of trust law which are not applicable to contract law and insurance policies have nevertheless been imposed upon insurance policies despite the provision in ERISA that insurance policies are not to be held in trust. 29 U.S.C. § 1103(a) and (b).

(4) Because the preemption clause has been broadly interpreted and the saving clause has been more narrowly interpreted, Congress' stated intent to leave the regulation of the "business of insurance" to the states even though stated twice in ERISA[11] has not been closely adhered to.

(5) The courts in some instances have applied law developed under LMRA, not just to ERISA in general, but to insurance policies held to be "plans," and this despite the saving clause.

(6) The courts have failed to develop a federal common law of ERISA despite legislative history that indicates that courts have this responsibility and despite pronouncements in earlier decisions of the Supreme Court that this would be done.

(7) The courts have failed to provide "other appropriate equitable relief" in any effective manner.

---

**11.** 29 U.S.C. § 1144(b)(2)(B), 29 U.S.C. § 1144(d).

(8) Finally, although protection of "employees and their beneficiaries" has been repeatedly recognized as the "ultimate touchstone"[12] or "crucible of congressional concern"[13] in adopting ERISA, and it has been further recognized that the Act as a whole should be interpreted and not just a "single sentence" or a single word or a single phrase,[14] nevertheless, that has generally not been the guiding beacon for interpreting ERISA in the area of health insurance benefits.[15]

ERISA is an extremely long and complicated act. A number of different areas in ERISA have proven difficult to interpret. When a new comprehensive statute is adopted, courts will decide a case and establish a premise. Another case will establish another premise. As more and more decisions are handed down, one premise is built upon another premise and on and on goes the process. If not careful, courts can eventually reach a conclusion clearly contrary to Congressional intent and this can be true in spite of good intentions. Comprehensively putting together all of these decisions affecting different areas of ERISA is one of the major problems in regard to ERISA and group health insurance policies.

Realizing that the results now being reached in ERISA cases are so contrary to Congress' stated intent, this Court cannot but attempt to determine what has brought this about. Hence, this Court will analyze, as best it can, what has produced this result.

### A. CONGRESSIONAL INTENT NOT GUIDING BEACON.

As already indicated the Supreme Court has repeatedly held that Congressional intent is the "ultimate touchstone." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. at 45, 107 S.Ct. at 1551–52. The Court went further in *Pilot Life* to hold, " ' " " "in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." ' " ' " (Citations omitted), *Id.* at 51, 105 S.Ct. at 1555. The object and policy of ERISA is to protect employees and their beneficiaries. Its very name indicates the thrust of the impetus for the act—Employee Retirement Income Security Act of 1974.

Mr. Justice Rehnquist speaking for the Court in *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982), held:

> ... in rare cases the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and *those intentions must be controlling.* We have reserved "some 'scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning ... would thwart the obvious purpose of the statute.' " (Citations omitted.)

458 U.S. at 572, 102 S.Ct. at 3251, 73 L.Ed.2d at 981. The principle enunciated in *Griffin* has not been applied to ERISA cases.

A simple procedure that would help insure that Congressional intent is followed when courts consider whether insurance policies are welfare benefit plans under ERISA would be to ask "are employees and beneficiaries better off under this interpretation than they were before ERISA was adopted?" That is precisely the process that Justice O'Connor followed in *Firestone Tire & Rubber,* when speaking for the Court she wrote "... Firestone's reading of ERISA would ... afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 113, 109 S.Ct. 948, 955, 103 L.Ed.2d 80 (1989). It is difficult to reconcile the acknowledgment of Congress' clearly stated intent as controlling with the reality of what is seen at the trial level.

---

**12.** *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. at 45, 107 S.Ct. at 1551–52 and *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. at 747, 105 S.Ct. at 2393.

**13.** *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. at 141, 105 S.Ct. at 3090.

**14.** *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. at 51, 107 S.Ct. at 1554–55.

**15.** It was the guiding beacon in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

A failure to put more emphasis on Congress' express intent in passing ERISA is one of the major causes contributing to the results that are being reached in ERISA cases.

## B. HOLDING THAT THE MERE PURCHASE OF INSURANCE CONSTITUTES A PLAN.

In an early decision the Fifth Circuit held, "Considering the *history, structure and purpose of ERISA,* we cannot believe that that Act regulates bare purchases of health insurance where ... the purchasing employer neither directly or indirectly owns, controls, administers, or assumes responsibility for the policy or its benefits." (Emphasis added.)

*Taggart Corp. v. Life & Health Benefits Admin., Inc.,* 617 F.2d 1208, 1211 (5th Cir.1980); *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981). Despite that holding, the only cases reviewed by this Court which do not hold a group insurance policy purchased through an employer to be an ERISA plan are *Taggart, supra,* and *Gahn, supra,* both cases involving businesses with none but family employees. In cases subsequent to *Taggart,* the Fifth Circuit has held group insurance policies to be "plans" and covered by ERISA even though the employer neither owned, controlled or assumed responsibility for the policies. *See Memorial Hosp. Systems v. Northbrook Life Ins. Co., supra.* The only requirement to make a group insurance policy an ERISA plan seems to be a "minimal" amount of administrative responsibility.[16] Consequently, in practical effect, despite *Taggart's* holding to the contrary, ERISA does, in effect, regulate the bare purchase of group health insurance policies by employers if they assume even "minimal" administrative responsibility. In general, controlling case law has construed the term "plan" very liberally to bring about ERISA

coverage. This was clearly demonstrated in *Memorial Hospital, supra,* when the Court stated "Memorial argues ... that the insurance policy ... cannot itself be an ERISA plan.... *We disagree.*"[17] 904 F.2d at 240. (Emphasis added.)

29 U.S.C. § 1103 is entitled "Establishment of Trust." Subsection (a) of § 1103 is entitled "Benefit Plan Assets to be Held in Trust." § 1103(a) and (b) provide:

> Except as provided in subsection (b) of this section, all *assets* of an employee benefit plan shall be held in trust ... (b) "Exception." The requirement of subsection (a) of this section shall not apply—(1) to *any asset* of a plan *which consists of insurance contracts or policies* issued by an insurance company qualified to do business in a state. (Emphasis added.)

Thus it is seen that the insurance policy itself is not treated in ERISA as a plan itself but rather is treated as an asset of a plan. Additionally title to the insurance policy, unlike other property of the plan is not to be held in trust. Why? It seems logical to assume that insurance policies are excluded from the trust requirements of ERISA for the reasons stated in the statute itself. Insurance policies are exempt from the trust provisions if "issued by an insurance company *qualified to do business in a state.*" 29 U.S.C. § 1103(b). (Emphasis added.) And "*nothing* in this subchapter shall be construed to *exempt or relieve any* person from *any* law of *any* state *which regulates insurance.*" 29 U.S.C. § 1144(b)(2)(A) (saving clause). (Emphasis added.) It is clear that Congress felt that insurance policies regulated by state laws (including statutes and case law) were adequately protected without placing trust requirements on such policies. This is further borne out by another specific exemption of ERISA. "*Nothing* in this subchapter shall be construed to *alter,* amend, *modify,* invali-

---

**16.** *Memorial Hosp. System v. Northbrook Life Inc. Co., supra,* held that a group insurance policy was a plan despite the fact that the employer's functions "under the policy are minimal." 904 F.2d at 243.

**17.** In *Taggart, supra,* the Secretary of Labor made basically the same argument as *Memorial Hospital.* However the *Taggart* court refused to

hold that subscribing to a MET established a benefit plan. *Donovan, supra,* also declined to hold that an insurance policy constituted a plan but described the purchase of insurance as "only a method of implementing a plan, fund, or program and [as] evidence of the existence of a plan but ... *not itself a plan.*" 688 F.2d at 1375. (Emphasis added.)

date, or *impair* any law of the United States." 29 U.S.C. § 1144(d). (Emphasis added.) The McCarran–Ferguson Act, 15 U.S.C. § 1011 et seq., provides that the "business of insurance, and *every* person engaged therein shall be subject to the laws of the several states." 15 U.S.C. § 1012(a). (Emphasis added.) The word "subchapter" used in the saving clause, (29 U.S.C. § 1144(b)(2)(A)) refers to 29 U.S.C. § 1144 which contains the preemption clause as well as the saving clause and the deemer clause. The phrase "shall be construed" found in the saving clause was directed at the Courts. *Thus Congress in effect said "nothing in the preemption clause shall be construed by the courts to exempt or relieve any person from any state law of any state which regulates insurance."* In other words Congress directed the courts not to construe the preemption clause to "exempt or relieve any person from any law of any state which regulates insurance." 29 U.S.C. § 1144(b)(2)(A).

Congress in ERISA twice clearly stated it intended the states to continue to regulate the "business of insurance," once in the saving clause and again in the clause disclaiming any modification of previously existing federal law. An insurance policy is insurance business whether sold to an individual or a plan. Together these provisions plainly indicate (1) that insurance policies constitute benefits of a plan, and they are not the plan itself, and, (2) insurance policies are to be regulated by state law not ERISA trust requirements. It should be pointed out that the words "nothing," "any," "alter," "exempt," and "relieve" used in 29 U.S.C. § 1144(b)(2)(A), 29 U.S.C. § 1144(d) and 15 U.S.C. § 1012(a) are all comprehensive terms. They do not require extraneous support for their breadth. More comprehensive terms cannot be found in the English language than the words "nothing," "any," and "every."

When insurance policies themselves are construed to be plans and state laws regulating insurance are preempted, or the remedies are preempted, beneficiaries do not have the protection Congress intended and thought employees retained when it exempted insurance policies from trust requirements and saved state laws regulating insur-ance. They have less protection than they had before ERISA was passed.

The *Taggart* court recognized the distinction between a "plan" and "assets" of a plan.

The supposed Taggart "plan" has no assets and is liable for no benefits. There is nothing to be placed in trust, so there is no trust. The corporation did no more than make payments to a purveyor of insurance ... There simply exists no assets for ERISA's statutory safeguards to protect.... Congress has elsewhere clearly distinguished between "health plans" and "health insurance." I.R.C. §§ 105(a), 105(e).... That Congress has thus chosen to treat the two separately reinforces our conclusion that ERISA "plans" are broader in concept than pure insurance transactions of the sort involved here. 617 F.2d at 1211 (Citations omitted.)

The *Taggart* Court traced the legislative history to ascertain Congress' intent in adopting ERISA provisions that made distinctions between "plans," "benefits," "assets" and insurance policies purchased by "plans."

ERISA's legislative history demonstrates that its drafters were principally concerned with abuses occurring in respect of private pension assets. "The assets of private plans, estimated to be in excess of $150·billion, constitute the only large private accumulation of funds which [sic] have [sic] escaped the imprimatur of effective federal regulations." H.R.Rep. No. 93–533, 93d Cong., 2d Sess. 3, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 4639, 4641. To forestall misappropriation and misuse of such funds, Congress mandated that all employee benefit plans be established in the form of a trust, 29 U.S.C.A. § 1103 (West 1975), subject to federal standards of fiduciary duty. 29 U.S.C.A. § 1104 (West 1975). Congress acted further to ·assure the integrity of employee benefits by mandating annual reports, 29 U.S.C.A. § 1023 (West 1975), containing both actuarial data and certified financial statements. For enforcement purposes, ERISA "plans" are suable entities. 29 U.S.C.A. § 1132(d)(1) (West

1975). In light of this statutory framework, we think the words "plan, fund, or program," 29 U.S.C.A. § 1002(1) (West 1975), cannot fairly be said to describe Taggart's subscription to SMET. 617 F.2d at 1211. Although the *Taggart* Court did not specifically refer to the provision of 29 U.S.C. § 1103 which provides that insurance policies are not to be held in trust, it did generally cite that section and it clearly reached that conclusion.

The Supreme Court in *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) also recognized the distinction between "plans" and "benefits" of "plans." In that case the Court held that a Georgia statute which *specifically prohibited garnishment* of benefits held by an ERISA plan was preempted, but that a general Georgia statute on garnishment *would allow the garnishment* of a plan and was not preempted and thus a judgment creditor could garnishee an ERISA plan to collect benefits the plan held for an employee judgment debtor. The Court recognized "Congress demonstrated that it could, where it wished to, stay the operation of state law as it effects only benefits and not plans." 486 U.S. at 836, 108 S.Ct. at 2188. The *Mackey* Court further recognized that Congress in some instances treated welfare benefit plans and pension benefit plans differently. *Id.* at 837, 108 S.Ct. at 2189. The Courts have been much less prone to find ERISA preemption in suits brought by · persons not beneficiaries than they have been in cases brought by "employees or beneficiaries" against insurance companies to collect benefits, and despite the fact that "beneficiaries," not third parties, are the people ERISA was adopted to protect.

29 U.S.C. § 1002 defines an ERISA plan as any "plan, fund or program ... *maintained ... through the purchase* of insurance or otherwise." (Emphasis added.) The fact that this definition section provides that a *plan*, fund or program *can be maintained* "through the purchase of insurance" again indicates that insurance is something to be

purchased by a plan. It is not the plan itself. It is a benefit of a plan. It ·seems to this Court that "plan," "fund," or "program" are basically synonymous terms. It likewise seems to this Court that what Congress was talking about when it referred to "plan," "fund," or "program," is the process or scheme put into place by an employer whereby the employer provides benefits and not just an insurance policy by itself.

The Supreme Court in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), recognized the distinction between "benefits" and "plans" stating:

> It is for this reason that Congress preempted state laws related to *plans* rather than simply to *benefits*. Only a plan embodies a set of administrative practices vulnerable to the burden that would be imposed by a patchwork scheme of regulation.

482 U.S. at 11, 107 S.Ct. at 2217. The Court went on to hold: "To do little more than write a check hardly constitutes the operation of a benefit plan." *Id.* at 12, 107 S.Ct. at 2218.

> The foregoing makes clear ... why ERISA is concerned with regulating benefit "plans" ... only "plans" involve administrative activity potentially subject to employer abuse.

*Id.* at 14, 107 S.Ct. at 2218–19.[18]

The *Taggart* Court's decision was rooted in the Court's concern with "the history, structure and purpose of ERISA." 617 F.2d at 1211. The Court in *Fort Halifax Packing* and *Mackey* likewise looked to Congress' overriding intent in passing. ERISA.

Based upon the reasoning outlined above, this Court has serious reservation as to whether Congress intended a group insurance policy by itself, purchased in whole or in part by an employer to provide health insurance benefits for five employees, to be considered "a welfare benefit plan." Perhaps the single biggest reason that employees and beneficiaries are getting less protection than they had before Congress passed ERISA is

---

18. Mr. Justice White, in his dissent in *Fort Halifax Packing*, recognized that the essence of the Court's holding was that what constitutes a plan is "the existence of an 'administrative scheme.'" 482 U.S. at 23, 107 S.Ct. at 2224.

the effect of holding that an insurance policy per se can be a "plan." However this Court is bound by *Memorial Hospital, supra,* which construed an insurance policy by itself as a welfare benefit plan.

## C. THE PREEMPTION CLAUSE HAS BEEN BROADLY INTERPRETED WHILE THE SAVING CLAUSE HAS BEEN INTERPRETED NARROWLY.

Controlling case law has interpreted the preemption clause in its "broadest" [19] sense as previously discussed. Under "Part III. Controlling Law on the Saving Clause" this Court also discussed the breadth of the statutory language in the saving clause. Despite the breadth of the language used in the saving clause, in general it has been interpreted much more narrowly than the preemption clause, causing one writer to refer to the "narrow provision of 29 U.S.C. § 1144(b)(2)(A) known as the 'saving clause'".[20]

As indicated, the preemption clause was given the broadest possible meaning in *Shaw v. Delta Air Lines, Inc., supra,* and *Pilot Life Ins. Co. v. Dedeaux, supra.* The net of preemption was declared to catch any state law if it had "a connection with" or "reference to" a plan. It was specifically declared *not to be limited to "state laws specifically designed* to affect employee benefit plans." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. at 41, 107 S.Ct. at 1550. (Emphasis added.) This is true even though *Metropolitan Life Ins. Co. v. Massachusetts,* had held, "the presumption is against preemption." 471 U.S. at 741, 107 S.Ct. at 2390. The savings clause was given a more narrow interpretation in *Pilot Life* than the preemption clause. To be saved a state law might not just "have an impact on the insurance industry, but *must be specifically directed* toward that industry." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. at 50, 107 S.Ct. at 1554. (Emphasis added.) Thus a bad faith claim was preempted because it was general in applica-

tion and not specific to the insurance industry.

One reason often cited for interpreting the preemption clause in its broadest sense is that the preemption clause as finally adopted by Congress has been stated to be broader than the preemption clause contained in earlier versions of the Act. *See, Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. at 745-46, n. 23-24, 105 S.Ct. at 2392-93, n. 23-24. The final version preempted state laws that "relate" to a "benefit plan," while an earlier version would have preempted state laws "related to the subject matter regulated by this Act." 29 U.S.C. § 1144(a) (preemption clause) and S. 4, 93rd Cong., 1st Sess., S. 609(a) (1973). One can make a case that "subject matter" regulated by this Act (ERISA) is far broader than "relate to" a "benefit plan." In some instances "relate to" is broader than "subject matter" and in other instances "subject matter" is broader than "relate to." It depends on the context. However, "relate to" is certainly more precise and specific and can be more easily defined and is probably better draftsmanship. As Mr. Justice Stevens wrote, "the final version is perhaps best explained as an editorial amalgam of two bills rather than as a major expansion of the section's coverage." *FMC Corp. v. Holliday,* dissenting opinion 498 U.S. at 67, 111 S.Ct. at 412. In *Metropolitan Life,* the Court likewise stated, "There is no suggestion that the pre-emption provision was broadened out of any concern about state regulation of insurance contracts...." 471 U.S. at 745, n. 23, 105 S.Ct. at 2392, n. 23.

A more recent case indicates that the preemption clause and the saving clause may be interpreted co-extensively in the future. *FMC Corp. v. Holliday, supra,* held that a Pennsylvania law on subrogation could not be enforced against a self-funded ERISA plan by virtue of the deemer clause. Justice Stevens dissented because he would have interpreted the preemption clause much more narrowly, thus letting the Pennsylvania subrogation law apply to the self-insured welfare

---

**19.** *Hansen v. Continental Ins. Co.,* 940 F.2d at 979.

**20.** Hello ERISA, Goodbye Bad Faith: Federal Preemption of DTPA, Insurance Code, and Common Law Bad Faith Claims. 41 Baylor Law Review 267 at 270.

benefit plan. Under Justice Stevens' reasoning neither the saving clause nor the deemer clause would have come into play.

This seven to one decision written by Justice O'Connor appears to hold that the preemption clause and the saving clause are coextensive. *FMC Corp.* seems to recognize that insurance policies are assets purchased by plans and do not constitute the plan itself. That Court held;

> An insurance company that insures a plan remains an insurer for purposes of state laws "purporting to regulate insurance" after application of the deemer clause. The insurance company is therefore not relieved from state insurance regulation. The ERISA plan is consequently bound by state insurance regulations insofar as they apply to the plan's insurer.

*FMC Corp. v. Holliday*, 498 U.S. at 61, 111 S.Ct. at 409.

> In the McCarran–Ferguson Act, 15 U.S.C. § 1011 et seq., Congress provided that the "business of insurance, and every person engaged therein shall be subject to the laws of the several states which relate to the regulation or taxation of such business." 15 U.S.C. § 1012(a). We have identified laws governing the "business of insurance" in the act to include not only direct regulation of the insurer but also regulation of the substantive terms of insurance contracts. *Metropolitan Life Ins. Co. v. Mass., supra,* [471 U.S.] at 742–744 [, 105 S.Ct. at 2390–91]. By recognizing a distinction between insurers of plans and the contracts of those insurers which are subject to direct state regulation, and self-insured employee benefit plans governed by ERISA, which are not, *we observe Congress' presumed desire to reserve to the states the regulation of the business of insurance.* (Emphasis added.)

*Id.* at 62–63, 111 S.Ct. at 409–10.

> ... the saving clause retains the independent effect of protecting state insurance regulation of insurance contracts purchased by employee benefit plans. ... if a plan is insured, a State may regulate it indirectly through regulation of its insurer and its insurer's insurance contracts; if the plan is uninsured, the State may not regulate it. As a result, employers will not face "conflicting or inconsistent State and local regulation of employee benefit plans."

*Id.* at 64, 111 S.Ct. at 410.

Justice Stevens in his dissent argued:

> The Court has endorsed an unnecessarily broad reading of the words "relate to any employee benefit plan" as they are used in the basic preemption clause of § 514(a). I acknowledge that this reading is supported by language in some of our prior opinions. It is not however, dictated by any prior holding and I am persuaded that Congress did not intend this clause to cut nearly so broad a swath in the field of state laws as the Court's expansive construction will create.... Moreover, the legislative history of the provision indicates that throughout most of its consideration of preemption, Congress was primarily concerned about areas of possible overlap between federal and state requirements.

*Id.* at 66–67, 111 S.Ct. at 411–12.

> When there is ambiguity in a statutory provision preempting state law, we should apply a strong presumption against the invalidation of well-settled, generally applicable state rules. In my opinion this presumption played an important role in our decisions in *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1 [, 107 S.Ct. 2211, 96 L.Ed.2d 1] (1987), and *Mackey v. Lanier Collection Agency and Service, Inc., supra.*

*Id.* at 67, 111 S.Ct. at 412.

> ... The text of the clause itself plainly reveals that it was designed to protect pension plans from being subjected to the detailed regulatory provisions that typically apply to all state regulated insurance companies....

*Id.* at 69, 111 S.Ct. at 413.

The courts generally have applied the broad sweeping net of ERISA preemption not only to state regulatory provisions mentioned by Justice Stevens but also to state substantive laws regulating insurance or at least to the remedies under such state laws. As a practical matter it really doesn't matter whether an insurance policy per se is declared not to be a welfare benefit plan, thus

preemption does not apply and state laws regulating insurance are preserved, or to hold that preemption and the saving clause are co-extensive and thus state laws are saved. The end result is the same and that is consistent with Congress' stated intent. Although such an interpretation does not give an employee more security or protection, it does interpret ERISA so that he doesn't have less protection than before ERISA was adopted. The same result would also follow from a more restricted interpretation of the preemption clause, as advocated by Justice Stevens in *FMC Corp.*

*FMC Corp.*'s apparent holding that the saving clause is co-extensive with the pre-emption clause is consistent with an earlier Supreme Court decision. In *Metropolitan Life Ins. Co. v. Massachusetts, supra,* the Court held:

> While § 514(a) of ERISA broadly pre-empts state laws that relate to an employee-benefit plan, that pre-emption is substantially qualified by an 'insurance saving clause,' § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A), which broadly states that, ... nothing in ERISA 'shall be construed to exempt or relieve any person from any law of any state which regulates insurance, banking, or securities.'

471 U.S. at 733, 105 S.Ct. at 2385–86.

> The insurance saving clause preserves any state law 'which regulates insurance, banking or security' ... while the general preemption clause broadly preempts state law, the saving clause appears broadly to preserve the state's lawmaking power over much of the same regulation.

*Id.* at 739–740, 105 S.Ct. at 2388–89.

> *The presumption is against preemption,* and we are not inclined to read limitations into federal statutes in order to enlarge their preemptive scope. (Emphasis added.)

*Id.* at 741, 105 S.Ct. at 2389–90.

The Court further noted:

> Congress' "primary concern" in enacting McCarran–Ferguson was to "ensure that the states would continue to have the ability to tax and regulate the business of insurance".... The ERISA saving clause,

with its similarly worded protection of "any law of any state which regulates insurance" appears to have been designed to preserve the McCarran–Ferguson Act's reservation of the business of insurance to the states.... Moreover, § 514(d) of ERISA, 29 U.S.C. § 1144(d) explicitly states in part: "Nothing in [ERISA] shall be construed to alter, amend, modify, invalidate, impair or supersede any law of the United States." Thus application of the McCarran–Ferguson Act lends further support to our ruling that Congress did not intend mandated benefit laws to be preempted by ERISA.

> The conference committee report merely stated: "The *preemption provisions* of Title I *are not to exempt* any person from any state law that regulates insurance." ... The preemption clause apparently was broadened out of a fear that "state professional associations" would otherwise hinder the development of such employee benefit programs as "prepaid legal service programs" ... The conference committee that was convened to work out differences ... broadened the general preemption provision.... The change gave the insurance *saving clause* a much more significant role, as a provision that *saved an entire body of law* from the sweeping general preemption clause.... *The saving clause is broad on its face and specific in its reference.* (Emphasis added.)

*Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. at 744–746, fns. 21, 22, 105 S.Ct. at 2391–93, fns. 21, 22.

> We therefore decline to impose any limitation on the saving clause beyond those Congress imposed in the clause itself.... If a state law "regulates insurance," as mandated benefit laws do, it is not preempted.

*Id.* at 746, 105 S.Ct. at 2392.

> We are aware that our decision results in a distinction between insured and uninsured plans, leaving the former open to indirect regulation while the latter are not.... We also are aware that appellant's construction of the statute would eliminate some of the disuniformities currently facing national plans that enter into

local markets to purchase insurance. Such disuniformities, however, are the inevitable result of the Congressional decision to "save" local insurance regulation. Arguments as to the wisdom of these policy choices must be directed at Congress.

*Id.* at 747, 105 S.Ct. at 2393.

In *Fort Halifax Packing, supra,* the Court noted "ERISA preemption analysis 'must be guided by respect for the separate spheres of governmental authority preserved in our federalist system.'" [482 U.S. at 18, 107 S.Ct. at 2221,] 96 L.Ed.2d at 16 (citation omitted).

### D. CONSIDERATION OF CONGRESSIONAL INTENT, WHAT CONSTITUTES A PLAN, THE PREEMPTION CLAUSE AND THE SAVING CLAUSE AS THEY INTERRELATE.

Both *FMC Corp. v. Holliday, supra,* and *Metropolitan Life Ins. Co. v. Massachusetts, supra,* recognize that insurance policies are not themselves welfare benefit plans, but rather they are purchased by welfare benefit plans and that both the policies and the insurance companies issuing them are subject to "state insurance regulation." Both of these cases seem to hold that the preemption clause and the saving clause are co-extensive.

This Court has not found a Supreme Court decision that specifically answers the question of whether an insurance policy per se is or is not a welfare benefit plan. As indicated above, *FMC Corp.* and *Metropolitan Life* seem to assume than an insurance policy is not a plan as they both discuss the policy as being something to be purchased by a welfare benefit plan and subject to state insurance regulation. This interpretation is certainly consistent with the ERISA provision that insurance policies are assets of plans. The results in *Fort Halifax Packing, supra,* and *Mackey, supra,* are also consistent with the rulings in *FMC Corp.* and *Metropolitan Life.* However, in *Pilot Life Ins. Co. v. Dedeaux, supra,* the Supreme Court assumed but did not decide that an insurance policy was a plan. It appears to this Court that the language of *FMC Corp.* is contrary to the result of *Pilot Life,* although there are distinctions between *Pilot Life* and *FMC Corp.*

Although this Court is persuaded that an insurance policy per se is not a welfare benefit plan, it is bound by the holding in *Memorial Hosp. System v. Northbrook Life Ins. Co., supra,* which specifically held that an insurance policy is a plan, even though that decision was handed down before *FMC Corp.* (but only by some three and one-half months), since *FMC Corp.* just clarified what was held in *Metropolitan Life* decided some eight years earlier. *Metropolitan Life,* however, obviously was not generally understood to say what *FMC Corp.* clearly spelled out that *Metropolitan Life* did hold.

Holding that an insurance policy is an asset of an plan rather than a plan is a distinction without a difference if it is determined that nevertheless the policy is subject to the same requirements as the plan itself. This Court knows of no controlling decision holding that an insurance policy is an asset of a plan, not a plan itself, but subject to the same requirements as a plan. Insurance policies purchased by a plan should not be subject to the same regulation as the plan itself and that was the essence of the holding in *FMC Corp.* That conclusion is supported by the fact that: (1) an insurance policy is not to be held in trust as are other assets of a plan, 29 U.S.C. § 1103, (2) the saving clause, 29 U.S.C. § 1144(b)(2)(A), and (3) the reaffirmation in ERISA of all federal statutes, 29 U.S.C. § 1144(d), specifically the McCarran–Ferguson Act. Again, if the saving clause is co-extensive with the preemption clause it is immaterial as to whether an insurance policy is interpreted as being or not being a plan.

### E. FEDERAL COMMON LAW AND OTHER EQUITABLE RELIEF.

In *Massachusetts Mut. Life Ins. Co. v. Russell, supra,* the Court held that § 409(a), 29 U.S.C. § 1109(a) "Liability for Breach of Fiduciary Duty" did not provide a cause of action for extracontractual damages caused by improper or untimely processing of benefit claims. In a concurring opinion four members of the Court pointed out, "The Court today expressly reserves the question

whether extracontractual damages might be one form of 'other appropriate relief' under § 502(a)(3)." 473 U.S. at 157, 105 S.Ct. at 3098. The concurring opinion noted, "we save for another day the [question of] ... 'the nature and extent of the appropriate equitable relief ... to redress' such violations under § 502(a)(3)." 473 U.S. at 150, 105 S.Ct. at 3094; and pointed out that "other appropriate equitable relief" was available, "to 'redress' *any* act or practice which violates *any* provision of this title or the terms of the plan.'" 473 U.S. at 153, 105 S.Ct. at 3096. (Emphasis in original.)

In various cases handed down subsequent to *Russell, supra,* there continued to be an expectancy that employees and beneficiaries could obtain relief under 502(a)(3)'s "other appropriate equitable relief." In *Corcoran v. United Healthcare, Inc., supra,* the Court held that "other appropriate equitable relief" did not include "emotional distress and mental anguish damages." 965 F.2d at 1338. However, the Court did state:

> "[T]he characterization of equitable relief as encompassing damages necessary to make the Plaintiff whole may well be consistent with the trust law principles that were incorporated into ERISA and which guide its interpretation.... Restatement Second of Trust allows for monetary damages as make whole relief providing that a beneficiary has 'the option of pursuing a remedy which would put him in the position in which he was before the trustee committed the breach of trust' or 'of pursuing a remedy which will put him in the position in which he would have been if the trustee had not committed the breach of trust.' ... 'the general rule [is] that the object of damages is to make the injured party whole ... to put him in the same condition in which he would have been if a wrong had not been committed.... Both direct and consequential damages may be awarded.'" (Citations omitted.)

*Corcoran v. United Healthcare, Inc.,* 965 F.2d at 1336.

Section 502(a)(3) not only speaks of obtaining "other appropriate equitable relief" but provides that such relief is "to redress ... violations" of the plan or ERISA. 29 U.S.C. § 1132(a)(3)(B). *Black's Law Dictionary,* 6th Ed.1990 at 1279, defines the word "redress" as follows: "Satisfaction for an injury or damages sustained. Damages or equitable relief."

There continued to be an expectancy that employees and beneficiaries could obtain redress under "other appropriate equitable relief" until the most recent decision of the Supreme Court in *Mertens. Mertens* interpreted the term "other appropriate equitable relief" much more narrowly than had the Fifth Circuit in *Corcoran.* The Court in *Mertens* strongly indicated that appropriate equitable relief precludes "awards for compensatory or punitive damages." *Mertens v. Hewitt Associates,* 508 U.S. at ——, 113 S.Ct. at ——, 124 L.Ed.2d at 170. Although that opinion recognized that "the term 'equitable relief' can assuredly mean, as petitioners and the Solicitor General would have it, whatever relief a court of equity is empowered to provide in the particular case at issue" *Id.,* 508 U.S. at ——, 113 S.Ct. at ——, 124 L.Ed.2d at 170, the Court in that case declined to so interpret the phrase "other appropriate equitable relief." The Court noted that the petitioners did not seek a remedy "traditionally viewed as 'equitable,' such as injunction or restitution." *Id.,* 508 U.S. at ——, 113 S.Ct. at ——, 124 L.Ed.2d at 170. The Court was concerned in that case that if the term "other appropriate equitable relief" was not so limited that there would be no effect given to the modifier "equitable." This Court has reviewed a number of cases holding what "other appropriate equitable relief" is not. This Court has not reviewed a single controlling opinion allowing any "other appropriate equitable relief" or holding what relief if any is afforded under that provision of ERISA.

In view of *Mertens* and the fact that not a single controlling case has allowed recovery under "other appropriate equitable relief," this Court concludes that there is little if any redress or relief available to an employee or beneficiary under § 502(a)(3)'s "other appropriate equitable relief." The *Mertens* Court spoke of injunctive relief. However, that remedy is specifically provided in § 1132(a)(3)(A) to enjoin any act or practice

which violates any provision of this subchapter or the terms of the plan. Since Congress specifically granted the remedy of injunctive relief in subsection (3)(A) Congress could not have intended for that to be included in the term "other appropriate equitable relief" found in subsection (3)(B). In *Mackey, supra,* the Court said, "As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." 486 U.S. at 837, 108 S.Ct. at 2189. Additionally, the fact that the word "other" is used in subsection 3(b) is an indication that Congress intended the phrase "other appropriate equitable relief" to include relief in addition to relief provided in other subsections of ERISA. The use of the word "appropriate" indicates that this relief should be responsive to the problem. Restitution is basically a meaningless remedy as to questions of insurance. An insured does not want restitution of the premiums that he has paid, he wants coverage for his medical bills. Section 1132(a)(1)(B) gives the employee beneficiary the right to "recover benefits due him under terms of the plans, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;" that is a much broader remedy than restitution. Simply requiring an insurance company to make restitution of insurance premiums is not "equitable relief" to "redress" violations of a policy of insurance.

The Court in *Mertens* expressed great concern to make sure that the modifier "equitable" was given meaning, and in so doing, as a practical matter determined that the phrase "other appropriate equitable relief" has no real or effective meaning. At this stage, under present controlling case law this Court cannot think of a situation in which "other appropriate equitable relief" would give any employee or beneficiary any meaningful relief in addition to other relief specifically provided under ERISA. If that is correct then the term "other appropriate equitable relief" has no real meaning. When this matter comes on for trial, this Court will permit the attorneys to brief or otherwise show the Court that it is wrong in its conclusion about "other appropriate equitable relief."

Various pronouncements of the Supreme Court in regard to a "federal common law" in regard to ERISA also created great expectation for a number of years. In *Firestone Tire & Rubber Co. v. Bruch, supra,* the Court pointed out, "we have held that courts are to develop 'a federal common law of rights and obligations under ERISA—regulated plans.' *Pilot Life Ins. Co. v. Dedeaux, supra,* [481 U.S.] at 56 [, 107 S.Ct. at 1557]." 489 U.S. at 110, 109 S.Ct. at 954. The Court also stated, " " '[A] body of federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans.' " " (Citations omitted.) *Id.* Although many cases since *Pilot Life* and *Firestone Tire & Rubber* have talked about a "federal common law" related to ERISA, and that the federal courts will develop such, this Court has not found a single controlling case establishing any remedy whatsoever under the theory of either "federal common law" or "a body of federal substantive law" related to ERISA. In *Medina v. Anthem Life Ins. Co., supra,* the plaintiff was pointing "to legislative history that indicates a willingness on the part of Congress to allow federal courts to mold a federal common law of ERISA." *Medina,* 983 F.2d at 31. The Court in that case, although noting that, "the House budget committee 'reaffirmed the authority of the federal courts to shape legal remedies to fit the facts and circumstances of the cases before them, even though those remedies may not be specifically mentioned in ERISA itself,' " concluded that Congress had "had almost two decades" and had not developed any additional remedies and that the Court was "loath to take this initiative" on its own. 983 F.2d at 31. This result was reached, despite the fact that the Supreme Court had previously indicated that such a "common law" was called for by the legislative history of ERISA and that the courts would develop such a "body of federal substantive laws." *Pilot Life, supra.* Although other courts have repeatedly spoken of developing a "federal common law" related to ERISA, the *Medina* decision indicates that the courts are not going to develop any such "federal com-

mon law." [21] This void still exists in spite of the fact that ERISA was enacted in 1974, almost 20 years ago, a period of time equivalent to two-thirds of the period of time designated as a single generation.

> [T]he workers ERISA was intended to protect lack a remedy for wrongs unaddressed by the statute, while the companies targeted by Congress employ ERISA as an effective shield against responsibility for wrongful processing of claims.... Under ERISA, insureds who provide group benefit plans have little incentive to deal promptly and fairly with employee participants.

*Cathey v. Metropolitan Life Ins. Co.*, 805 S.W.2d 387, 392–93 (Tex.1991) (Doggett, J., concurring).

### F. INTERPRETING INSURANCE POLICIES UNDER TRUST LAW AND LMRA.

ERISA is replete with trust terminology and references. Consequently, courts have repeatedly held that remedies are to be viewed from a vantage point of traditional trust law. Courts have not been careful to distinguish between group health insurance policies, other plan assets, and ERISA requirements relating to plan administration, when talking about trust law's application under ERISA. That failure is also one of the contributing causes of employees having less protection under prevailing case law interpreting ERISA than they had before ERISA was adopted.

ERISA specifically provides that all assets of an employee benefit plan, with the exception of insurance policies "shall be held in trust." Insurance policies "issued by an insurance company qualified to do business in a State" are specifically exempted from being held in trust. 29 U.S.C. § 1103(a)(b). There is perfectly good reason why Congress exempted insurance policies from trust requirements.

An insurance policy and a trust are two entirely different legal entities. *Black's Law Dictionary's* 1508 (6th ed. 1990) defines a "trust" as "a legal entity created ... for the benefit of designated beneficiaries.... The trustee holds ... the trust's corpus assets and income for the economic benefit of all of the beneficiaries.... A fiduciary relation-

---

**21.** The holding of the Supreme Court in *U.S. v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), is indicative of the fact that the federal courts should either (1) develop a federal common law in the area of health insurance policies covered by ERISA, or (2) not interpret ERISA preemption so broadly as to preempt so many long-standing state laws in the health insurance area. That case presented the question of the priority of liens involving federal lending programs. In holding that this was a federal question to be resolved by federal courts, but that state law would form the basis for such federal law, the Court said:

> This Court has consistently held that federal law governs questions involving the rights of the United States arising under nationwide federal programs. As the Court explained in *Clearfield Trust Co. v. United States*, 318 US, [363] at 366–367, 87 L Ed 838, 63 S Ct 573 [, at 574–575]: *"When the United States disburses its funds* or pays its debts, *it is exercising a constitutional function or power....* In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards." (Citations and footnote omitted.)

440 U.S. at 726, 99 S.Ct. at 1457. (Emphasis added.)

> Federal law therefore controls the Government's priority rights. The more difficult task,

to which we turn, is giving content to this federal rule.

> Controversies directly affecting the operations of federal programs, although governed by federal law, do not inevitably require resort to uniform federal rules. (Citations omitted.)

440 U.S. at 727, 728, 99 S.Ct. at 1457, 1458.

> *... we decline to override intricate state laws of general applicability on which private creditors base their daily commercial transactions.*

> Incorporating state law to determine the rights of the United States as against private creditors would in no way hinder administration of the SBA and FHA loan programs.

440 U.S. at 729, 99 S.Ct. at 1459. (Emphasis added.)

If in an area so important to the federal government as "disburs(ing) its funds" 440 U.S. at 726, 99 S.Ct. at 1457, it is appropriate to "decline to override intricate state laws of general applicability on which private creditors *base their daily commercial transactions."* 440 U.S. at 729, 99 S.Ct. at 1459 (emphasis added), that logic is equally persuasive in the field of health insurance where individual people *"daily" base their physical and mental well-being as well as their overall health* on access to medical facilities by relying on the validity of insurance policies they or their employer have purchased. This is even more so when Congress twice said regulating the business of health insurance should be *left to the states.*

ship in which one person is the holder of the title to property ... for the benefit of another." *Black's Law Dictionary* goes further to define a "trustee" as "a person holding property in trust.... One who holds legal title to property 'in trust' for the benefit of another person (beneficiary).... The trustee owes a fiduciary duty to the beneficiary." *Id.* at 1514. An insurance policy on the other hand is a contract and is governed by contract law. Trust law and contract law are vastly different. Under trust law a trustee or fiduciary generally cannot have a conflict with a beneficiary. A trustee or fiduciary is required to act in the best interest of his beneficiary. Every time an insurance company pays a claim to an insured, it is a cost or liability, not to a corpus of a trust, but to the insurance company itself. Payment of a claim diminishes profits to stockholders. Thus, there is a direct conflict between the best interest of an insured and the best interest of the insurance company. Trust law generally prohibits conflicts between the trustee or fiduciary and the beneficiary. "Because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business." *Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1561 (11th Cir.1990) The relationship between insureds and insurers does not meet the basic definition of a trust arrangement. It is clear why Congress exempted insurance policies from trust requirements. However, this distinction has not been clearly maintained in case law interpreting ERISA.

ERISA was modeled after the Labor–Management Relations Act (LMRA). 15 U.S.C. § 1012(b). That is why some courts early on reviewed ERISA matters under an arbitrary and capricious standard. There is, however, a basic difference between LMRA and ERISA coverage of health insurance policies. ERISA has a saving clause as to state laws regulating insurance. There is no such saving clause in LMRA. It is clear that in the area of labor relations and contracts addressed by LMRA, Congress intended federal law to be exclusive. See 29 U.S.C. § 185. That is not true in the area of regulating insurance policies. In ERISA, Congress clearly stated that this was a matter for the several states. In view of the saving clause and McCarran–Ferguson Act, it is inappropriate to use the LMRA analogy to mere group health insurance policies found to be ERISA plans. Further, since Congress' primary purpose in passing ERISA was to protect "employees and their beneficiaries," to subject group health insurance policies to LMRA analogy provides less, not more, protection to "employees and their beneficiaries."

### G. RESULTS.

Even though 29 U.S.C. § 1102(a)(1) provides that "every employee benefit plan shall be established and maintained pursuant to *a written instrument*" (emphasis added), it has been held that even where there is no written instrument nonetheless a plan exists.[22] "A formal document designated as 'the Plan' is not required to establish that an ERISA plan exists." *Memorial Hosp. Systems v. Northbrook Life Ins. Co.*, 904 F.2d at 241. "Accordingly, an insurance company can avoid state laws by virtue of ERISA preemption even though there is no written plan. Conversely, it has been held that oral representations, misrepresentations, or promises cannot be enforced by the employee or beneficiary against an insurance company because they are not written in the policy and collecting on such an oral promise or misrepresentation would be contrary to ERISA's requirement that a plan shall be pursuant to a written instrument." *Williams v. Bridgestone/Firestone, Inc.*, 954 F.2d 1070 (5th Cir.1992). Thus the failure to reduce a plan to writing, despite ERISA's clear language does not preclude an insurance company from avoiding coverage by virtue of ERISA's preemption, but such failure can prevent an employee or beneficiary from recovering from the oral promise or misrepresentation not in writing. In both instances the employee has less protection than he had

---

**22.** In *Donovan, supra,* the Court in determining what constitutes a plan said "pursuant to a writ-

ing or not." 688 F.2d at 1373.

prior to ERISA and the responsibility for reducing the plan to writing is not that of the "employee or beneficiary" but it is the responsibility of the employer or insurance company.[23]

The contradiction in what Congress mandated and what is happening is further demonstrated in *Memorial Hosp. Systems v. Northbrook Life Ins. Co., supra.* The Court went into great detail to analyze the interrelationship between health providers (hospitals) and health insurers (insurance companies). In determining that a Texas law was not preempted in a suit brought by a health provider against an employer and a plan insurer, the Court concluded: "Enforcing the allocation of risks between commercial entities that conduct business in a state is a *classically important state interest.*" 904 F.2d at 246 (Emphasis added). This conclusion was reached even though plaintiff's measure of damages would be determined under what the Court found to be an ERISA plan. Regulating *the business of insurance is also classically an important state interest.* Further, Congress specifically spelled out in ERISA in two instances that regulating insurance was a matter of state, not federal interests. 29 U.S.C. § 1144(b)(2)(A) and 29 U.S.C. § 1144(d). No such deference has been given to the saving clause when employees bring suit against an insurance company, despite the specific language of the saving clause and despite the reaffirmation of the McCarran–Ferguson Act. This is hard to understand in view of Congress' express purpose in adopting ERISA of providing protection to employees and their beneficiaries.

In *Memorial Hospital, supra,* the Court went on to say, "To insulate the insurance carriers from liability leaves the medical care provider without recourse...." 904 F.2d at 236. Yet employees and beneficiaries have been left with "no recourse" even where there may have been a "serious mistake," *Corcoran v. United Healthcare, Inc.,* 965 F.2d at 1338, and even where there is "fraud or misrepresentation," *Hansen v. Continental Ins. Co.,* 940 F.2d at 979. It should not

require mention that ERISA was passed to protect "employees and their beneficiaries" and that no where does ERISA state an intent to protect health providers.

It is incongruous to place so much emphasis on the intent of Congress in regard to preemption, which is only one part of ERISA and not to be equally concerned about Congress' intent as to the overall purpose of the bill. Particularly is this so when Congress' overall intent is spelled out in the act itself, 29 U.S.C. § 1001, and resort must be had to conference reports and speeches of individual senators or representatives on the floor to ascertain intent on preemption. Again, this is not to suggest that deference to Congressional intent in regard to preemption is not appropriate or is misplaced. It is intended to suggest that the clearly and statutorily stated intent of Congress in regard to its overall purpose should be followed just as assiduously.

When an analysis is made of present controlling case law under ERISA in the field of health insurance, it seems that when most major provisions or terms have had to be interpreted, an interpretation has prevailed that provided less protection to "employees and their beneficiaries," than they had before ERISA was adopted. This Court is hard pressed to think of situations in which an employee or beneficiary today has more protection in the area of health insurance benefits under ERISA than he would have had before ERISA. There are a number of protections that he had under various state laws that he no longer has by virtue of specific holdings in regard to state law claims. These have already been enumerated. That is hard to reconcile with the pronouncements that the intent of Congress is controlling. No one decision or area of interpretation alone devastated Congress' stated intent. However, when they are all placed one on the other, Congress' stated intent is devastated.

The analysis of present controlling case law could lead one to conclude that federal

23. In *Taggart, supra,* the Court stated "It is not surprising that appellants have refrained from adopting the Secretary's line of argument. Taggart Corp. has not taken the first step toward bringing a 'single employer benefit plan' into compliance with ERISA. Acceptance of the Secretary's position conceivably could result in Taggart's criminal prosecution. 29 U.S.C.A. § 1131 (West 1975)." 617 F.2d at 1211.

courts may be more concerned with "Congress's goal in creating an exclusive federal enclave for the regulation of benefit plans" *Memorial Hosp. System v. Northbrook Life Ins. Co., supra,* 904 F.2d at 244, than in following Congress' paramount purpose in providing more security for employees and their beneficiaries.

## H. PUNITIVE DAMAGES.

Although eliminating punitive damages might not have been on Congress' mind when ERISA was passed,[24] an analysis of *Pilot Life, supra,* and *Mertens, supra,* indicates that it certainly is the result of those two cases. While this Court has no brief, per se, for punitive damages,[25] it is greatly concerned that the well-settled principles of

state law relating to the business of insurance despite being reserved to the states by Congress when ERISA was passed, have been preempted by the judiciary. Punitive damages could well have been addressed as a constitutional issue without emasculating state laws regulating the business of insurance developed over many years. There are many areas of tort law in which a plaintiff is not particularly vulnerable. The field of health insurance, however, is not such a field. In most instances of health insurance coverage, for "employees and their beneficiaries," the plaintiff is extremely vulnerable. For a wage earner who is earning no more than enough to provide food, clothing and shelter, an unexpected large medical bill, not covered by insurance, although he felt confident he

**24.** *Mertens v. Hewitt Associates,* 508 U.S. at ——, n. 7, 113 S.Ct. at 2069, n. 7, 124 L.Ed.2d at 171, n. 7.

**25.** As indicated above, this Court has no particular brief for punitive damages. It has seen excesses and abuses of punitive damage claims. Some plaintiff attorneys seem to think every claim is a bad faith claim. Some plaintiff attorneys try to use bad faith as a club to force favorable settlements. Verdicts in some bad faith claims clearly have had no relationship to actual damages sustained and seem way out of proportion to reason. Consequently, the abolition of punitive damages in ERISA cases is not troubling per se to this Court. What is troubling to this Court is the fact that the federal judiciary has taken away by interpretation, state remedies for "employees and beneficiaries" and there has been nothing developed to replace it, despite Congress' stated intent to provide protection to employees and beneficiaries. It is troubling to this Court in that these state laws regulating insurance, carefully crafted over many years, or the remedies, have been made inapplicable to most group health insurance. And that there is little left to regulate the terms of purchasing insurance, canceling policies, and denial of claims. If the purpose of Congress or the language utilized by Congress required this, that would be a different story, but it does not.

While this Court has seen some plaintiffs and their attorneys motivated by greed, and has seen an abuse of bad faith and punitive damages, this Court has seen a comparable degree and amount of greed from some insurance companies and some insurance defense attorneys in defending health insurance claims that should never have been denied, but which were denied, simply because there was no perceived exposure or downside to denying the claim under their perception of ERISA and how it would be interpreted by the Courts and because some defense counsel, like

some plaintiff counsel, want to earn as large a fee as possible. All of this is to point up the fact that greed and selfishness are not limited either to plaintiffs or defendants. It is not limited to employees and beneficiaries or to insurance companies that issue group insurance policies. Unfortunately greed and selfishness are traits of man in general. That is why it has been necessary to adopt extensive laws to prevent man's inhumanity to man. There needs to be a balance. When the pendulum swings too far one way it surely swings back the other way. The courts are now in the process of determining where the pendulum stops or how far it should swing.

One can certainly make a case that an implied purpose of Congress in adopting ERISA was to hold down insurance costs by adopting uniform regulations. Consistent with that would be the Supreme Court's decision in *Pilot Life Ins. Co. v. Dedeaux, supra,* that insurance policies purchased by a welfare benefit plan are not subject to bad faith claims for punitive damages. That decision, which exempted most group health insurance policies from bad faith claims and punitive damages, was handed down more than seven years ago. Since that time there has been an unprecedented increase in the cost of all health insurance policies. Eliminating insurance companies' exposure to bad faith claims as to group health insurance policies does not appear to have been effective in holding down group health insurance costs. That is one of the reasons that health care is now one of the foremost domestic issues in America. This increase in cost is also one of the reasons many businesses contend they cannot afford to sponsor group health insurance for their employees. Consideration of the implied intent of Congress to hold down costs is certainly a proper judicial function along with consideration of the express stated primary purpose of congress to protect employees and beneficiaries.

was covered, can be devastating. It can deprive an employee and his family of medical care, it can cause extreme hardship if he attempts to pay the medical expenses at the expense of other necessary living expenses, or it can force him into bankruptcy as plaintiff alleges happened in this case.

### PART VIII. FRUSTRATION.

The overriding purpose of the judiciary is to provide justice. When Congress passes legislation and clearly sets out the purposes and intentions of such legislation, "to protect ... the interests of participants in private pension plans and their beneficiaries," 29 U.S.C. § 1001, and Courts acknowledge that ERISA "is a comprehensive statute designed to promote the interests of employees and their beneficiaries," *Shaw v. Delta Air Lines, Inc.,* 463 U.S. at 91, 103 S.Ct. at 2897, 77 L.Ed.2d at 497, and yet the Courts have to say "for what may have been a serious mistake there is 'no remedy, state or federal'" *Corcoran v. United Healthcare, Inc.,* 965 F.2d at 1338, or even worse, ERISA's preemption may leave a victim of fraud or misrepresentation without a remedy *Hansen v. Continental Ins. Co., supra,* something is wrong. The system isn't working. Either Congress is incapable of writing legislation to accomplish what they plainly say is their intent, or the Courts lack the ability to interpret the statute to do what Congress plainly says it intended to do, or both, or a mixture. In any event, the system fails.

History in general teaches that the older a civilization becomes the more it tends to become weighted down with bureaucracy and technicality. This inevitably helps bring about the demise of great civilizations. The length of this opinion is a testimony to the complexity and technicality that we have engrafted upon a simple claim to collect nominal health insurance benefits. This opinion demonstrates the complicated analysis currently required for a simple health insurance claim. Although we must interpret and construct, we don't do this in a vacuum. Courts are relevant to the success of a democracy. Whenever we get so word bound that we interpret bare words contrary to clearly stated intent, we do disservice to justice and the cause of democracy. This is not to suggest that courts should legislate. To the contrary, courts should not legislate. But neither should we emasculate legislative intent. We are appointed to "administer justice." [26]

Most of the cases decided by the Supreme Court have involved large sums of money or important issues. But, the cases before this Court have not been of that magnitude. The cases before this Court have sought recovery of medical bills and have involved $5,000, $9,000, or $16,000 in this case. The trial courts see results that the appellate courts often do not see. The trial courts see the cases that are not appealed. There is no way of knowing how many Americans today are without insurance, or have had to take bankruptcy, or how many have simply given up on trying to enforce their hospital insurance policy because they do not want to or cannot come to federal court to litigate claims that involve so little and that by all reason should be resolved in the lowest state forum available, where costs and expenses and time do not equal that of the federal judiciary. In *Taggart, supra,* the Court analyzed the question of "whether this insurance case belongs in Federal Court" 617 F.2d at 1210, and concluding that it did not, held "Our decision, of course, leave appellants free to pursue their insurance claims in an appropriate state court." Most lawyers generally do not handle claims that they perceive will not either pay or justify payment of their fee. That is a simple fact of life. If a lawyer declines to bring a small suit in federal court involving hospital benefits under ERISA, the practical effect is that the beneficiary has no insurance coverage regardless of the facts and regardless of the fact that he would have had protection and insurance coverage prior to ERISA.

There has not been a single case that has been filed before this Court by an employee coming into federal court saying, "I want to protect my pension or my benefits under the broad terms of ERISA." Every single case brought before this Court has involved insurance companies using ERISA as a shield to

---

**26.** 28 U.S.C. § 453.

prevent employees from having the legal redress and remedies they would have had under long-standing state laws existing before the adoption of ERISA. It is indeed an anomaly that an act passed for the security of the employees should be used almost exclusively to defeat their security and leave them without remedies for fraud and overreaching conduct.

### PART IX. WHAT REMEDIES ARE AVAILABLE IN THIS CASE UNDER ERISA?

This Court has previously discussed what remedies are not available under ERISA and this Court's frustration because it feels that the result it is compelled to reach is contrary to the expressed intent of Congress. Nevertheless, this Court will attempt to determine what relief is available under ERISA consistent with controlling case law.

ERISA provides in § 502(a) that an employee or beneficiary may (1) recover accrued benefits, (2) obtain a declaratory judgment that he is entitled to benefits under the provisions of the plan contract, (3) enjoin the plan administrator from improperly refusing to pay benefits in the future, (4) ask for removal of the fiduciary if the plan administrator's refusal to pay contractually authorized benefits was wilful and part of a larger systematic breach of fiduciary obligations, and (5) clarify rights to future benefits. *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. at 53, 107 S.Ct. at 1556, and *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. at 147, 105 S.Ct. at 3092–93. The employer or beneficiary may also recover attorney fees under § 502(g), 29 U.S.C. § 1132(g)(1), *Russell,* 473 U.S. at 147, 105 S.Ct. at 3092–93, and *Pilot Life,* 481 U.S. at 53, 107 S.Ct. at 1556. In *Hansen v. Continental Ins. Co., supra,* the Court held that a plan beneficiary could also collect prejudgment interests, post-judgment interests and attorney's fees. 940 F.2d at 983, 984. Although the Court in *Russell,* said, "Finally, in answer to a possible concern that attorney's fees might present a barrier to maintenance of suits for small claims, thereby risking underenforcement of beneficiaries' statutory rights, it should be noted that ERISA authorizes the award of

attorney's fees." 473 U.S. at 147, 105 S.Ct. at 3092–93. Although the early cases pointed out that attorney's fees are available, the Court has seen very few cases, with the exceptions of *Hansen, supra,* and *Donovan, infra,* where it appears attorney's fees were awarded.

In *Donovan v. Cunningham,* 716 F.2d 1455 (5th Cir.1983), *cert. denied* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984), the Fifth Circuit determined that the district courts are to use the following factors in determining whether a fee award is appropriate: "(1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to pay an award of attorney's fees; (3) whether such an award would act as a deterrent; (4) whether the party requesting the award sought to benefit all participants of the plan or to resolve a significant legal issue involving ERISA; and (5) the relative merits of the parties' positions." *Id.* at 1475.

Based upon the foregoing it would appear to the Court that the plaintiff under ERISA should be allowed to develop its allegation that the defendant sought to insure small employers and that policies were issued with very little investigation in regard to prior medical history prior to writing such plans and that when claims exceeded $10,000, they were targeted for denial. Since injunctive relief is available to correct failures to comply with ERISA, it appears that plaintiff should be able to develop the appropriate history in this regard to determine whether such an allegation is or is not well founded. This will enable the Court to fashion the appropriate relief in this case and to prevent abuses, if they exist in the future. It will also have a bearing on what attorney's fees, if any, are allowable. It will also be appropriate to determine whether or not the defendants have taken appropriate steps to provide an appropriate ERISA summary plan and whether defendants are complying with other provisions of ERISA.

Although this Court feels the result reached in this case is contrary to the stated intent of Congress in passing ERISA, and that this decision provides the employee less protection, not more, nevertheless, this Court

is bound by precedents established by the Supreme Court and the Fifth Circuit.

### PART X. PROCEDURE.

The Plaintiff's request for a jury trial against Defendants Pan American and NIS will be denied under the authority of *Calamia v. Spivey*, 632 F.2d 1235, (5th Cir.1980). However, the Plaintiff is entitled to a jury trial against the Defendant Tapper. Since Plaintiff is not entitled to a jury trial against two Defendants, but is entitled to a jury trial against one Defendant, the Court will schedule a conference with the parties to consider the most efficient manner to proceed under these circumstances.

The Plaintiff should be allowed thirty (30) days to file an amendment seeking appropriate ERISA relief against the Defendants, Pan American and NIS.

### PART XI. CONCLUSION.

The Court is therefore of the opinion that Plaintiff is entitled to assert a claim for benefits using the appropriate ERISA remedies but that his State law claims in this regard are preempted. Defendants' Motion for Summary Judgment as to the improper processing of Plaintiff's claim is GRANTED to the extent Plaintiff asserts a claim under State law for benefits and it is so ORDERED.

The Court is further of the opinion that Plaintiff's State law claims for breach of contract, fraud in the inducement and negligent and/or intentional misrepresentations as to Defendants Pan American and NIS are preempted by ERISA and Defendant Pan American's and Defendant NIS' Motions for Summary Judgment in this regard are GRANTED and it is so ORDERED.

The Court is further of the opinion that none of the Plaintiff's claims asserted against Defendant Tapper are preempted and thus Defendant Tapper's Motion for Summary Judgment is DENIED in its entirety and it is so ORDERED.

The Court is further of the opinion that the interests of justice require that the Plaintiff be entitled to amend his complaint, if necessary, to assert proper claims under ERISA, and that such be accomplished within thirty (30) days of the entry of this order, and it is so ORDERED.

Plaintiff's request for a jury trial against Defendants Pan American and NIS is denied. Plaintiff's request for a jury trial against the Defendant Tapper is granted. It is so ORDERED.

SO ORDERED AND ADJUDGED.